No. 52,961

STATE OF KANSAS, *ex rel.,* NICK A. TOMASIC, WYANDOTTE COUNTY DISTRICT ATTORNEY, *Relator,* v. KANSAS CITY, KANSAS PORT AUTHORITY, *Respondent.*

(636 P.2d 760)

Opinion on rehearing filed November 25, 1981. (For original opinion filed April 1, 1981, see 229 Kan. 538, 626 P.2d 209; for original opinion on rehearing filed June 29, 1981, see 230 Kan. 19, 630 P.2d 692.)

*Nick A. Tomasic,* district attorney, argued the cause for the relator.

*John A. Price,* of Weeks, Thomas & Lysaught, Chartered, of Kansas City, argued the cause, and *Leonard O. Thomas,* of the same firm, *Norman E. Gaar,* of Gaar & Bell, of Kansas City, Missouri, and *John F. Steineger, Jr.,* of Kansas City, were with him on the briefs for the respondent.

*David Schauner,* of Kansas National Education Association, of Topeka; *Patricia Baker,* of Kansas Association of School Boards, of Topeka; *Lana Jeanne Tyree* and *John F. Cooper,* of Oklahoma City, Oklahoma and *Robert Miller,* of Kansas City, all of Unified School District # 203 of Wyandotte County, were on the brief for *amici curiae.*

The opinion of the court was delivered by

SCHROEDER, C.J.: This quo warranto action, challenging the constitutionality of the Port Authorities Act, K.S.A. 12-3401

*et seq.,* as amended, as well as the authority of the Kansas City, Kansas Port Authority to develop an industrial-use facility for the General Motors Corporation, has a brief but complicated history before this court due to the preferential setting afforded both the original action in quo warranto and the rehearing.

On April 1, 1981, this court announced its decision granting the relator's writ of quo warranto. That brief opinion, reported in *State ex rel. Tomasic v. Kansas City, Kansas Port Authority,* 229 Kan. 538, 626 P.2d 209 (1981), was to be supplemented by a formal opinion; however, before the formal opinion was prepared, the Kansas Legislature amended K.S.A. 12-3401 *et seq.,* in L. 1981, ch. 76 (HB 2462), effective April 18, 1981, and the Board of Commissioners of the City of Kansas City, Kansas, amended its Code of Ordinances and adopted a resolution consistent with the amendments. Due to the impact of actions taken by those governing bodies on the General Motors Project, this court granted a motion for rehearing on April 22, 1981. In the opinion on rehearing filed June 29, 1981, this court denied relator's writ of quo warranto. The second abbreviated opinion, reported in *State ex rel. Tomasic v. Kansas City, Kansas Port Authority,* 230 Kan. 19, 630 P.2d 692 (1981), fully details the procedural posture of the case before this court, obviating the necessity for an extended explanation in this formal opinion which sets forth our reasons for granting the writ of quo warranto in the original action and denying it on rehearing.

The Port Authorities Act, K.S.A. 12-3401 *et seq.,* was originally enacted by the 1969 legislature. It authorized cities and counties for the first time to create local port authorities which would be public bodies corporate and politic, functioning as agencies of the state upon establishment. Prior to the transaction of any business or exercise of powers under the Act, the city or county would, by appropriate ordinance or resolution, declare "that there is need for an authority to function in the city or county and that such authority is herein established."

On August 29, 1978, the city of Kansas City, Kansas, declared a need for a port authority and by ordinance created the respondent, granting it all duties and powers provided by the Act.

The respondent adopted a plan for the development of certain real property located in Kansas City, Kansas, which is in the "corridor" of proposed Interstate Highway 435. The respondent

intends to issue or cause to be issued revenue bonds to pay the costs of acquisition and development of the property. It intends to construct an industrial plant and related facilities for the assembly and manufacture of vehicles and automotive products, and to acquire and install in the plant certain items of machinery and equipment, all for *lease* to General Motors Corporation for their use and occupancy.

In conjunction with the General Motors Project, the respondent obtained purchase options on approximately 527 acres of land bounded by Parallel Parkway on the north, State Avenue on the south, 110th Street on the east, and 118th Street on the west. The respondent also obtained options on approximately 175 acres of land located at the southeast corner of 110th Street and Parallel Parkway. The 527-acre parcel of land is intended for the GM automobile assembly plant and related facilities, including a railroad marshalling yard. The adjacent 175 acre parcel is intended for a railroad tail track, a railroad auto-truck unloading facility, and a private truck transport haul-away terminal for hauling new vehicles to dealer destinations from the GM plant and from the railroad unloading facility.

In furtherance of its plan for development, the respondent adopted a resolution of intent to issue not exceeding $500 million principal amount of industrial development revenue bonds. The respondent also adopted a resolution authorizing *a lease agreement* with GM and a contract for the purchase and construction of the improvements, fixtures, equipment, and other related support facilities of the project. An "Interim Agreement" between respondent and GM provides for the acquisition, construction, equipping, and financing of the project by the respondent and the *lease* of the project to GM. The interim agreement provides for the respondent to issue the bonds to provide funds necessary to finance the acquisition, construction, and installation of the facilities, as well as to pay the expenses of issuing the bonds. Prior to issuing the bonds and upon adoption by the respondent of an amended plan, the respondent and GM will enter into *a lease agreement* providing for the *lease* of the facilities and land to GM for an initial term ending on the date of final maturity of the bonds. The proposed *lease agreement* will provide for semi-annual rental payments by GM and give GM an option, subject to the provisions of the Act, of purchasing the land and facilities

after or contemporaneous with full payment and retirement of the bonds. GM will, if required, enter into an agreement unconditionally guaranteeing full and prompt payment of the principal and interest on the bonds, as well as the premium, if any, payable on redemption of the bonds. In addition to rental payments as set forth in the proposed *lease agreement*, GM will make payments in lieu of taxes in accordance with a schedule attached to the interim agreement to be transmitted to the county treasurer and distributed to appropriate taxing jurisdictions.

The respondent proposes to proceed with the issuance of the bonds under the Act to finance acquisition of the lands and construction of the facilities, including the cost of establishing reserves and other related expenditures. The bonds, lands, and facilities are designed by the respondent to be exempt from taxes in accordance with K.S.A. 1980 Supp. 12-3418, now L. 1981, ch. 76, § 13.

General Motors is one of the largest industrial employers in Kansas City and Wyandotte County, Kansas, operating an automotive assembly plant in the Fairfax Industrial District since 1948. General Motors' Fairfax plant has, during the past few years, accounted for approximately 25% of all Wyandotte County's manufacturing employment. In the year 1979, the Fairfax plant employed approximately 5,223 employees, paid property taxes of approximately $1.4 million, had a total plant payroll of approximately $77 million, and locally purchased goods and services of a value of approximately $52 million.

Due to a number of factors (including inefficient and cramped manufacturing facilities, the need for expansion and modernization of those facilities, flood plain location, and impossibility of lateral expansion at the present site), GM decided to close the Fairfax plant and relocate with a modernized and expanded automotive assembly facility at a different location. The new plant, wherever located, will potentially employ approximately 6,000 workers and, based on experience at other plants, have a total annual payroll of approximately $125 million at current wage rates. In addition, the construction of the new plant will create employment for approximately 2,000 workers, with an estimated construction payroll, over a construction period of 24 to 27 months duration, of $101 million. The economic importance of such a plant to Kansas City, Kansas, and the State of Kansas is

readily apparent; however, controversy has arisen whether there is statutory authority in Kansas for a port authority to engage in such a project.

The general issues in both the original action in quo warranto and on rehearing are: (1) Whether the Port Authorities Act is unconstitutional in whole or in part; and (2) whether the Port Authorities Act authorizes the respondent, established pursuant thereto, to acquire land, construct an industrial-use facility thereon from the issuance and sale of industrial revenue bonds, and lease the facility to General Motors, as set forth in the stipulation of facts entered into by the parties.

The court is in essence construing two Port Authorities Acts in this opinion, the Port Authorities Act, K.S.A. 12-3401 *et seq.,* (as amended, 1980 Supp.) in the original action in quo warranto and the Port Authorities Act, L. 1981, ch. 76 (HB 2462) on rehearing. For ease of reference in the opinion, the former will be designated the Act prior to 1981 and the latter the Act as amended in 1981. Certain constitutional challenges are common to both Acts. These will be considered first.

I.

Article 11, Section 1 of the Kansas Constitution provides:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, except that the legislature may provide for the classification and the taxation uniformly as to class of motor vehicles, mineral products, money, mortgages, notes and other evidence of debt or may exempt any of such classes of property from property taxation and impose taxes upon another basis in lieu thereof. All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and all household goods and personal effects not used for the production of income, shall be exempted from property taxation."

It is contended Article 11, Section 1 is violated because the Port Authority doesn't pay any tax or any assessment on any property acquired and used by it or on income from bonds issued by it. It is contended, in particular, that the exemption doesn't have a public benefit or purpose and runs afoul of the uniform and equal assessment and taxation requirement.

Under the general rule all property is subject to taxation unless specifically exempted. *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. 39, 41-42, 542 P.2d 278 (1975). Property which is subject to taxation is taxed at a uniform and equal rate. *State ex rel. Stephan v. Martin,* 227 Kan. 456, 608 P.2d 880 (1980); *Gunkle v.*

*Killingsworth,* 118 Kan. 154, 156, 233 Pac. 803 (1925); *Sumner County v. Wellington,* 66 Kan. 590, 593, 72 Pac. 216 (1903). However, tax exemptions are constitutionally permissible. One type of tax exemption is the constitutional exemption which demands the property be "used exclusively" for specified purposes. *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. at 42; *Washburn College v. Comm'rs of Shawnee Co.,* 8 Kan. 344, 349 (1871). The constitution does not provide, however, that other exemptions may not be made. *City of Harper v. Fink,* 148 Kan. 278, 280, 80 P.2d 1080 (1938); *Gunkle v. Killingsworth,* 118 Kan. at 156. The legislature may provide other statutory exemptions if such exemptions have a public purpose and promote the general welfare. *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. at 42; *State, ex rel., v. Board of Regents,* 167 Kan. 587, 596, 207 P.2d 373 (1949); *Sumner County v. Wellington,* 66 Kan. at 593. Such statutory exemptions may be broader than the constitutional ones. *State, ex rel., v. Board of Regents,* 167 Kan. at 595-96; *Alpha Tau Omega v. Douglas County Comm'rs.,* 136 Kan. 675, 684, 18 P.2d 573 (1933). "Within the scope of legislative power, the legislature itself is the judge of what exemptions are in the public interest and will conduce to the public welfare." *Gunkle v. Killingsworth,* 118 Kan. at 157. Accord, *State, ex rel., v. Board of Regents,* 167 Kan. at 596.

K.S.A. 1980 Supp. 12-3418 provides:

"The exercise of the powers granted by this act will be in all respects for the benefit of the people of the state, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and as the activities and operations of a port authority will constitute the performance of essential governmental functions, no port authority shall be required to pay any taxes or assessments upon any property acquired and used by it under the provisions of this act or upon the income therefrom, and any bonds issued under the provisions of this act, their transfer and the income therefrom (including any profit made on the sale thereof) shall at all times be free from taxation within the state except that property acquired by a port authority shall be exempt from ad valorem property tax only until the calendar year in which the same is rented, leased, subleased or developed and returns revenue to such authority in excess of the amount necessary to retire the obligations of the port authority and pay administrative costs of the port authority, and in such year such property shall be placed upon the tax rolls and thereafter ad valorem property taxes shall be paid thereon as is provided by law. The provisions of this section shall not apply to state inheritance tax or any intangible tax."

It cannot be seriously contended the port authority property or

bonds will be "used exclusively" for one of the constitutionally enumerated exemptions. Therefore, the exemption, if valid, must meet the criteria for statutory exemption. The legislature has declared an exemption because the "exercise of the powers granted by this act will be in all respects for the benefit of the people of the state." K.S.A. 1980 Supp. 12-3418. Certainly, economic benefits flow from the powers vested in port authorities, and the court cannot say there is not public purpose and promotion of the general welfare in such benefits. The exemption is constitutionally valid.

The Act as amended in 1981, L. 1981, ch. 76, § 13, further provides that *property leased to another* shall be exempt from taxation and specifies time limitations for the industrial-use facility tax exemption provision, but does not otherwise change the statement of purpose in allowing the exemption. The constitutional challenge remains the same, and we find the provision as amended to be valid. New section 14 in L. 1981, ch. 76, provides some ameliorative relief to the exemption. "Leases and lease-purchase agreements between a port authority and the user of its facilities may provide for payment in lieu of taxes to the port authority." Such a provision for payment in lieu of taxes is contemplated in the General Motors Project.

We find without merit a contention that the tax exemption provisions improperly interfere with the assessment and collection of taxes for the operation of public schools. The legislature has granted these exemptions for purposes within the public interest and all taxing subdivisions are affected alike. All bear the burden of decreased revenue during the period of exemption, all share in any payment in lieu of taxes, and all enjoy increased revenues subsequent to the exemption period. Not to be overlooked is the massive expenditure of money for materials and services, including labor, in the local community resulting in economic activity that will generate additional tax revenues for all units of government.

If the people fear harsh or inequitable results under the statutory scheme, their recourse is to the legislative body since the court has determined the provisions constitutionally valid. *Wulf v. Kansas City,* 77 Kan. 358, 375, 94 Pac. 207 (1908). In this, as in all judicial review of legislative action, the court's position is to determine the constitutionality, not the wisdom, of legislation.

*State, ex rel., v. City of Overland Park,* 215 Kan. 700, 710, 527 P.2d 1340 (1974); *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 623, 364 P.2d 71 (1961); *State, ex rel., v. Fadely,* 180 Kan. 652, 659, 308 P.2d 537 (1957); *State, ex rel., v. City of Topeka,* 176 Kan. 240, 244, 270 P.2d 270 (1954).

The State contends there has been an unlawful delegation of legislative power without adequate standards and guidelines for the exercise of such power. The Kansas Constitution "separates, as much as it is possible or practicable to do so, the executive (art. 1, § 1), legislative (art. 2, § 1), and the judicial (art. 3, § 1) powers of our government." *State, ex rel., v. Drainage District,* 123 Kan. 191, 254 Pac. 372 (1927). Article 2, Section 1 vests legislative power in the legislature: "The legislative power of this state shall be vested in a house of representatives and senate." Any delegation of legislative power must be "authorized by some express provision of the constitution or . . . by reason of clear implication therefrom." *State, ex rel., v. Hines,* 163 Kan. 300, 303, 182 P.2d 865 (1947).

Article 2, Section 21 of the Kansas Constitution sanctions delegation of legislative power in limited circumstances. It provides: "The legislature may confer powers of local legislation and administration upon political subdivisions."

The Port Authorities Act prior to 1981 and the Act as amended in 1981 were intended to delegate legislative powers to city and county governing bodies to create port authorities. K.S.A. 1980 Supp. 12-3402(*a*); L. 1981, ch. 76, § 2(a). Cities and counties are political subdivisions of the state upon which the legislature may confer legislative power. *Koppel v. City of Fairway,* 189 Kan. 710, 712, 371 P.2d 113 (1962); *Kowing v. Douglas County Kaw Drainage Dist.,* 167 Kan. 387, 391, 207 P.2d 457 (1949).

The constitution operates to limit the power of legislation conferred to matters of local concern with which the city or county could be expected to deal more effectively than the legislature. *State, ex rel., v. City of Topeka,* 176 Kan. at 245-46.

K.S.A. 1980 Supp. 12-3406 provides that upon establishment of a port authority, it shall have full power and authority to:

"(a) Purchase, construct, sell, lease, and operate docks, wharves, warehouses, piers, and other port, terminal, transportation facilities or railroad facilities within its jurisdiction consistent with the purposes of the port authority, and to make charges for the use thereof, which shall be not less than the charges established for

the same services furnished by a public utility or common carrier in the particular port authority area;

"(b) borrow money from either private financial institutions or any agency of the state of Kansas or of the United States of America, and to issue therefor such notes or other evidence of indebtedness as may be required and to mortgage, pledge, or otherwise encumber the assets of the authority as security therefor;

"(c) apply for, receive, and participate in any grants from the state of Kansas or from the United States of America;

"(d) construct, straighten, deepen, and improve any canal, channel, river, stream, or other watercourse or way which may be necessary or proper in the development of the facilities of such port;

"(e) acquire, own, hold, sell, lease, or operate real or personal property for the authorized purposes of the port authority;

"(f) acquire, own, maintain, sell, or lease such land within its jurisdiction as it may deem desirable for the development, planning, construction, operation, or leasing of land for industrial use which exercise of such authorization is hereby declared to be for a public purpose;

"(g) apply to the proper authorities of the United States government for a grant within the limits of the port authority either individually or in conjunction with a corporate instrumentality of this state and one or more states, or a bi-state compact or a not-for-profit corporation authorized to do business in this state and when such grant is issued, to establish, operate and maintain foreign trade zones pursuant to the foreign trade-zone act, 19 U.S.C.A. 81a to 81u, inclusive, as amended;

"(h) exercise the right of eminent domain to appropriate any land, rights, rights-of-way, franchises, easements, or other property, necessary or proper for the construction or the efficient operation of any facility of the port authority and included in its official plan, pursuant to the procedure provided by law, if funds equal to the appraised value of the property to be acquired as the result of such proceedings shall be on hand and available for such purposes  . . . ."

None of these powers in themselves reach beyond the purview of local concern.

Laws 1981, ch. 76, § 4 amended the power and authority of a port authority but not in such a manner as to go beyond local concern:

"(a) Purchase, *acquire,* construct, *reconstruct, improve, equip, furnish, maintain, repair, enlarge, remodel, own,* sell, lease, and operate docks, wharves, warehouses, piers, and other ~~port, terminal, transportation facilities or railroad facilities~~ *water port facilities, airport facilities, terminal facilities, land transportation facilities, railroad facilities or industrial-use facilities* within *the area of* its jurisdiction consistent with the ~~purposes~~ *purpose* of the port authority; ~~and to make charges for the use thereof, which shall be not less than the charges established for the same services furnished by a public utility or common carrier in the particular port authority area~~ *which purpose is hereby declared to be for a public purpose;*

"(b) (1) borrow money from either private financial institutions or any agency of the state of Kansas or of the United States of America, and to issue therefor such

notes or other evidence of indebtedness as may be required and to mortgage, pledge, or otherwise encumber the assets of the authority as security therefor, *and (2) issue bonds as provided in K.S.A. 12-3415, and amendments thereto;*

"(c) apply for, receive, and participate in any grants from the state of Kansas or from the United States of America;

"(d) construct, straighten, deepen, and improve any canal, channel, river, stream, or other watercourse or way which may be necessary or proper in the development of the facilities of such port;

"(e) *purchase,* acquire, own, *maintain, furnish, improve, repair, enlarge, remodel, construct, reconstruct, equip,* hold, sell, lease, or operate real or personal property for the authorized purposes of the port authority *which exercise of such authority is hereby declared to be for a public purpose;*

"(f) acquire, own, maintain, sell, or lease such land within its jurisdiction as it may deem desirable for the development, planning, construction, operation, or leasing of land for industrial use which exercise of such authorization is hereby declared to be for a public purpose;

"(g) apply to the proper authorities of the United States government for a grant within the limits of the port authority either individually or in conjunction with a corporate instrumentality of this state and one or more states, or a bi-state compact or a not-for-profit corporation authorized to do business in this state and when such grant is issued, to establish, operate and maintain foreign trade zones pursuant to the foreign trade-zone act, 19 U.S.C.A. 81a to 81u, inclusive, as amended;

"(h)(g) exercise the right of eminent domain, *if approved by a ⅔ vote of the governing body of the port authority,* to appropriate any land, rights-of-way, franchises, easements, or other property, necessary or proper for the construction or the efficient operation of any facility of the port authority and included in its *an* official plan, pursuant to the procedure provided by law, if funds equal to the appraised value of the property to be acquired as the result of such proceedings shall be on hand and available for such purposes, except that:. *The port authority shall not exercise the right of eminent domain without first having received approval, by resolution, of the governing body of the city or county which created such port authority. If the port authority was created by two or more cities or counties, the port authority shall not exercise the right of eminent domain without first having received approval, by resolution, of the governing body of the city or county in which such property is located. If such property is located outside the boundaries of the port authority, such port authority shall not exercise the right of eminent domain without first having received approval, by resolution, of the governing body of the city if such property is located within the corporate limits of a city or from the board of county commissioners if such property is located within the unincorporated area of a county. A port authority shall not have the right of eminent domain to acquire a site for an industrial-use facility.*"

Since the powers are not in and of themselves violative of Article 2, Section 21, the inquiry becomes whether the jurisdiction of the port authority has been extended beyond local concern. Once established, a port authority's jurisdiction includes all

of the territory of the city or county creating it *as well as* any other property (1) conveyed to it, (2) over which it exercises control, and (3) acquired by it through eminent domain. K.S.A. 12-3405. The Act as amended in 1981 contains the same pertinent provisions. L. 1981, ch. 76, § 3. Although the jurisdiction extends beyond the boundaries of the city and/or county establishing the authority, any extension relates directly to the purpose and operation of the local port authority. It is unrealistic to fear far-flung extension of port authority jurisdiction, particularly in light of the required determination of local need. In *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P.2d 71 (1961), this court stated "the legislature and the people have the right to assume that public officials will exercise their express and implied powers fairly, honestly and reasonably." 188 Kan. at 619-20. We adhere to that view and conclude the Port Authorities Act prior to 1981 and the Act as amended in 1981 delegate powers of local legislation.

The final inquiry in determining the constitutionality of the Port Authorities Acts under Article 2, Sections 1 and 21, concerns adequacy of standards for exercise of the power delegated. While standards must accompany a grant of legislative authority, "great leeway should be allowed the legislature in setting forth guidelines or standards and the use of general rather than minute standards is permissible." *State ex rel., v. Bennett,* 222 Kan. 12, 21, 564 P.2d 1281 (1977). K.S.A. 1980 Supp. 12-3402 provides a general determination of need must precede any exercise of power.

"The authority shall not transact any business or exercise powers hereunder until or unless the governing body of the city by appropriate ordinance, or the county by appropriate resolution, declares that there is need for an authority to function in the city or county and that such authority is herein established."

Such a determination of need is constitutionally adequate when coupled with the assumption it will be made "fairly, honestly and reasonably."

The legislature in 1981 enacted a more detailed procedure with less discretion at the local level. Laws 1981, ch. 76, § 2 contains an expansive purpose statement and provides the port authority shall be created by ordinance or resolution with concurrent resolution by the legislature.

"*It is the purpose of this act to promote, stimulate and develop the general welfare, economic development and prosperity of the state of Kansas by fostering*

*the growth of intrastate and interstate commerce within the state; to promote the advancement and retention of ports within the state; to encourage and assist in the location of new business and industry in this state and the expansion, relocation or retention of existing business ˏand industry when so doing will help maintain existing levels of commerce within the state or increase the movement of commodities, goods and products produced, manufactured or grown within or without the state through existing ports within the state or lead to the development of new ports within the state; and to promote the economic stability of the state by maintaining and providing employment opportunities, thus promoting the general welfare of the citizens of this state, by authorizing port authorities* to be established in each city and in each county of the state~~,~~. A *port authority shall be* a public body corporate and politic which if established ~~shall be an agency of the state of Kansas and~~ shall be known as the 'port authority' of the city or of the county. Joint port authorities may be created under authority of this act by cooperative agreement executed by the governing bodies of any city or county or cities or counties. Such joint authorities formed by such cooperative agreement shall have all the powers and jurisdiction enumerated in this act. *Such creation shall be by ordinance or resolution and except for port authorities created prior to April 1, 1981, none shall be created without approval of the legislature by concurrent resolution.* The authority shall not transact any business or exercise powers hereunder until ~~or unless the governing body of the city by appropriate ordinance, or the county by appropriate resolution, declares that there is need for an authority to function in the city or county and that such authority is herein established~~ *the passage of a concurrent resolution by the legislature as hereinbefore provided."*

Furthermore, L. 1981, ch. 76 § 1(g) contains a factor test to be used at the local level to determine whether an agricultural, commercial, industrial or manufacturing facility not part of or adjacent to another port facility will further the purposes of the Act. The factors to be considered are:

"(1) *The desirability and economic feasibility of the proposed facility;*

"(2) *the technical and economic capability of the port authority or private interests to operate the proposed facility;*

"(3) *the potential economic impact of the proposed facility on the city or county in which the facility will be located;*

"(4) *the impact such facility will have on the development of interstate and intrastate traffic which will make use of ports within the state;*

"(5) *the impact such facility may have on the growth of new ports within the state; and*

"(6) *the impact such facility may have on any existent comprehensive land-use plan covering the proposed location of the facility."*

In the Act as amended in 1981, the legislature chose to exercise closer control over the creation of port authorities; it is its prerogative to do so. Both general and specific standards to guide the exercise of delegated power are constitutionally valid.

The final constitutional challenge common to the Act prior to 1981 and the Act as amended in 1981 alleges violation of Article 2, Section 16, of the Kansas Constitution which provides:

"No bill shall contain more than one subject, except appropriation bills and bills for revision or codification of statutes. The subject of each bill shall be expressed in its title. No law shall be revived or amended, unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed. The provisions of this section shall be liberally construed to effectuate the acts of the legislature."

The violation alleged is that the subject is not expressed in the title. "The purpose of a title is to direct the mind to the contents of a bill or of an act, so that members of the legislature and the public may be fairly informed and not deceived or misled as to what it embraces." *Water District No. 1 v. Robb,* 182 Kan. 2, 9, 318 P.2d 387 (1957). The title does not have to be a synopsis of abstract of the entire act in all its details. *State, ex rel., v. City of Pittsburg,* 188 Kan. at 621; *Water District No. 1 v. Robb,* 182 Kan. at 9.

The title of the Port Authorities Act as originally enacted in L. 1969, ch. 89 was: "An Act authorizing the establishment of port authorities in each city or county, as therein defined, or combination thereof; prescribing powers and duties thereof; authorizing issuance of revenue bonds."

Although not detailing every particular of the contents, the title is an adequate description of the contents of the bill. Neither the legislature nor the public would be misinformed or misled by this title. Finally, as a matter of statutory construction, this court will liberally construe a title for the purpose of upholding the constitutionality of a statute. *Water District No. 1 v. Robb,* 182 Kan. at 10; *State, ex rel., v. School District,* 163 Kan. 650, 659, 185 P.2d 677 (1947). We find no violation of Article 2, Section 16.

The title of House Bill No. 2462 which was enacted as L. 1981, ch. 76 reads as follows:

"An Act relating to port authorities; amending K.S.A. 12-3405, 12-3407, 12-3408, 12-3409, 12-3410, 12-3413, 12-3416, 12-3419 and K.S.A. 1980 Supp. 12-3401, 12-3402, 12-3406, 12-3412, 12-3415, 12-3418, 12-3420 and repealing the existing sections; and also repealing K.S.A. 12-2501 through 12-2513, inclusive."

This title expresses the subject matter and refers the reader, with particularity, to the amended and repealed sections. *Water District No. 1 v. Robb* presented a situation analogous to the one

at bar. The court found no violation of Article 2, Section 16, in the title of an act relating to water districts and approved the title of a later amendment which referred to the general subject matter and the specific amended or repealed sections. 182 Kan. at 9-11, 18-19. We find that reasoning persuasive and hold Article 2, Section 16, has not been violated by the title of the Act as amended in 1981.

## II.

The foregoing discussion resolves all constitutional challenges to the Port Authorities Act as it existed prior to 1981. Having resolved the constitutional challenges to the Act prior to 1981 and having found the Act as amended in 1981 constitutionally valid to the extent discussed above, we now turn to additional constitutional challenges asserted against the Act as amended in 1981.

K.S.A. 1980 Supp. 12-3402(a) "authorized to be established in each city and in each county of the state, a public body corporate and politic which if established shall be an agency of the state of Kansas and shall be known as the 'port authority' of the city or of the county." The language "agency of the state" raises the issue whether in authorizing the establishment of port authorities the state has become involved in works of internal improvement prohibited by Article 11, Section 9 of the Kansas Constitution. That section provides:

"The state shall never be a party in carrying on any work of internal improvement except that: (1) It may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor general obligation bonds issued by the state for such highways; (2) it may be a party to flood control works and works for the conservation or development of water resources."

In L. 1981, ch. 76, § 2, 12-3402(a) was amended to read: "A port authority shall be a public body corporate and politic which if established shall be known as the 'port authority' of the city or of the county." The deletion of the "agency of the state" language by the legislature in 1981 simplifies our analysis; however, the court looks to substance rather than mere form. 82 C.J.S., Statutes § 322a. In determining whether a port authority is indeed an agency of the state, we must look to the relationship between the authority and the state. While it is true the legislature retains a type of veto power over the creation of a port authority by a city or county because none can be created without approval of the legislature by concurrent resolution, L. 1981, ch. 76, § 2(a), the state cannot create a port authority without prior action by a city

or county. Furthermore, there is no financial commitment by the state; the obligations of the port authority are not obligations of the state. The port authority functions in word and in fact as a creation of the city or county. Even under the prior language referring to the port authority as an "agency of the state," the state was not engaging in acts of internal improvement. The port authority was merely an agency acting within the borders of the state. With the removal of that "agency" language, the legislature has now clarified its original meaning as to the relationship between the port authority and the state.

The prohibition of Article 11, Section 9, prevents the state *as a state* from engaging in works of internal improvement, with limited exceptions not here pertinent. *Leavenworth County v. Miller,* 7 Kan. 479, 493 (1871). Internal improvements are not prohibited per se. The state may authorize public or private corporations or individuals to construct internal improvements. 7 Kan. at 496. In the Act as amended in 1981 the state has authorized a public body to exercise the powers enumerated in L. 1981, ch. 76, § 4. Assuming *arguendo* that activities of a port authority constitute works of internal improvement, the state itself is not involved in the works of internal improvement. Article 11, Section 9, of the Kansas Constitution is not violated. See *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 205 N.W.2d 784 (1973); *State ex rel. Bowman v. Barczak,* 34 Wis. 2d 57, 148 N.W.2d 683 (1967); *Redevelopment Authority v. Canepa,* 7 Wis. 2d 643, 97 N.W.2d 695 (1959).

Several provisions of the Act as amended in 1981 relate solely to port authorities created prior to April 1, 1981. For example:

(1) In lieu of a determination that an industrial-use facility will further the purposes of the Act and promote the general welfare and economic development of the area or in lieu of the factor analysis for a facility not part of or adjacent to another port facility, "[a]ny such city or county and any port authority may find that an industrial-use facility, the proceedings for which commenced prior to April 1, 1981, will further the purpose of this act and promote the general welfare and economic development of such city or county based solely on the proposed cost of such facility when such cost exceeds $100,000,000." L. 1981, ch. 76, § 1(*g*).

(2) Port authorities may be created in each city or county of the

state or jointly by the cooperative agreement of the governing bodies of cities or counties. "Such creation shall be by ordinance or resolution and except for port authorities created prior to April 1, 1981, none shall be created without approval of the legislature by concurrent resolution." L. 1981, ch. 76, § 2(*a*).

(3) Notwithstanding provision for notice and hearing prior to adoption of a plan or modification, "a plan or any modification, amendment or extension thereof relating to an industrial-use facility with respect to which the notice required under K.S.A. 12-3407 or 12-3408, in effect prior to the effective date of this act, was given prior to April 1, 1981, shall be final and conclusive and the validity of such plan or any modification, amendment or extension thereof shall be conclusively presumed if it is adopted by the board of directors following a hearing for which notice is given, after the effective date of this act and at least five days prior to the hearing . . . ." L. 1981, ch. 76, § 7(*b*).

(4) A 10-year exemption from ad valorem property taxation is provided for industrial-use facility property "except that property acquired by a port authority from proceeds of port authority revenue bonds issued for . . . industrial-use facilities pursuant to a resolution of intent to issue such bonds as originally passed prior to April 1, 1981, whether or not such resolution of intent is later ratified, modified or amended, shall be exempt from ad valorem property taxes only for a period of 19 calendar years after the calendar year in which the bonds were issued." L. 1981, ch. 76, § 13.

The foregoing provisions are attacked as special legislation in violation of Article 2, Section 17, of the Kansas Constitution which provides:

"All laws of a general nature shall have a uniform operation throughout the state: *Provided,* The legislature may designate areas in counties that have become urban in character as 'urban areas' and enact special laws giving to any one or more of such counties or urban areas such powers of local government and consolidation of local government as the legislature may deem proper."

In amending the Port Authorities Act in 1981 the legislature did two things. It provided authority and guidelines for port authorities to establish industrial-use facilities, and it took curative action which retrospectively approved industrial-use facility proceedings commenced prior to April 1, 1981. It is that curative action which is being challenged under Article 2, Section 17.

Curative legislation, to be valid and constitutional, must meet two tests: (1) That the legislature originally had the power to authorize the acts done or to confer the powers exercised, and (2) that contracts are not impaired nor vested rights disturbed. *Beeler & Campbell Supply Co. v. Warren,* 151 Kan. 755, Syl. ¶ 2, 100 P.2d 700 (1940). See also *State, ex rel., v. School District,* 163 Kan. 650, 185 P.2d 677 (1947) and cases cited therein at 654-55.

Over the years, this court has found a variety of curative actions taken by the legislature to be valid. In *State, ex rel., v. School District,* a school district organized under a statute declared unconstitutional continued to transact business. The next legislature was able to enact bills to validate actions already taken because the legislature had the power to authorize the acts initially and, in the exercise of that power, could subsequently ratify the actions taken. No vested rights were impaired.

In 1882, the city of Leavenworth gave a water company the right to maintain a waterworks with the city having an option to purchase it after 20 years. At the time the ordinance was enacted, the city had no express power to purchase a waterworks. A later statutory amendment giving the city authority to purchase the waterworks was deemed an effective ratification of the earlier contract. *Leavenworth v. Water Co.,* 69 Kan. 82, 76 Pac. 451 (1904).

In the case at bar, the legislature always had the power to authorize port authorities to operate industrial-use facilities. The fact they had not effectively done so does not now preclude them from enacting curative legislation to ratify actions taken previously by a port authority. The specific actions before this court today were taken by the Kansas City, Kansas Port Authority in relation to the General Motors Project. It is unknown to the court whether other port authorities had commenced industrial-use facilities prior to April 1, 1981; however, the existence or nonexistence of other such projects does not affect the validity of the legislative action. The curative amendments would apply to any industrial-use facility commenced prior to April 1, 1981.

Since the legislature possessed the authority to take this action, the final inquiry is whether contracts were impaired. The unequivocal answer is there was no impairment of contracts; in fact, the effect of this curative legislation is to allow contracts entered into prior to the legislative amendment to be performed. Accord-

ingly, we find the curative legislation in the Act as amended in 1981 to be valid and constitutional. Curative legislation has long been recognized as a valid exercise of legislative power which is not special legislation in contravention of Article 2, Section 17. *Pollack v. Kansas City,* 87 Kan. 205, 213, 123 Pac. 985 (1912).

This court recently concluded in *Stephens v. Snyder Clinic Ass'n,* 230 Kan. 115, 631 P.2d 222 (1981), an opinion which upheld reduction of the discovery period of the statute of limitations from ten years to four years in medical malpractice actions, that Article 2, Section 17, requires all laws of a general nature to have geographically uniform operation throughout the state. "[T]he only prohibition contained in Article 2, Section 17, relates to laws of a general nature which affect the people of the state generally. Such laws must apply uniformly throughout the state and thus be *geographically* uniform." 230 Kan. at 127. (Emphasis in original.) That holding, as well as the history of Article 2, Section 17, developed in the *Stephens* opinion, provides further persuasive reasons the Act as amended in 1981 does not constitute special legislation in violation of the constitutional provision.

Finally, the Act as amended in 1981 is challenged as violative of the Equal Protection Clause of the United States Constitution. The equal protection attack is directed at the tax exemption provisions for port authorities, in particular those exemptions relating to industrial-use facilities and the curative legislation for proceedings commenced prior to April 1, 1981. Laws 1981, ch. 76, § 13 provides in pertinent part:

*"Property acquired by a port authority from proceeds of port authority revenue bonds issued for the purpose of purchasing, acquiring, constructing, reconstructing, improving, equipping, furnishing, repairing, enlarging or remodeling industrial-use facilities shall be exempt from ad valorem property taxation only for a period of 10 calendar years after the calendar year in which such bonds were issued, except that property acquired by a port authority from proceeds of port authority revenue bonds issued for the purpose of purchasing, acquiring, constructing, reconstructing, improving, equipping, furnishing, repairing, enlarging or remodeling industrial-use facilities pursuant to a resolution of intent to issue such bonds as originally passed prior to April 1, 1981, whether or not such resolution of intent is later ratified, modified or amended, shall be exempt from ad valorem property taxes only for a period of 19 calendar years after the calendar year in which the bonds were issued."*

Heretofore the Kansas Supreme Court has not directly addressed the constitutionality of tax exemption for the develop-

ment of new industry and the relocation or expansion of existing industry financed by local revenue bonds. Other jurisdictions have considered the issue and have upheld the constitutionality of tax exemption schemes. See, *e.g., DeArmond v. Alaska State Development Corporation,* 376 P.2d 717 (Alaska 1962); *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 131 N.W.2d 5 (1964); *Village of Deming v. Hosdreg Company,* 62 N.M. 18, 303 P.2d 920 (1956); *Elliott v. McNair,* 250 S.C. 75, 156 S.E.2d 421 (1967); *Darnell v. Co. of Montgomery,* 202 Tenn. 560, 308 S.W.2d 373 (1957); *County Court v. Demus,* 148 W.Va. 398, 135 S.E.2d 352 (1964). See generally Note, "Legal Limitations on Public Inducements to Industrial Location," 59 Colum. L. Rev. 618 (1959).

The Supreme Court of the United States has addressed the issue of the states' powers to levy taxes and grant exemptions as well as the parameters within which they must operate to avoid impinging on equal protection limitations. The principles are set out at some length in *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 3 L.Ed.2d 480, 79 S.Ct. 437 (1959). In that case, an Ohio statute exempted from ad valorem taxation merchandise warehoused by nonresidents if it were held in a storage warehouse for storage only. Plaintiff, a resident who operated several department stores and maintained warehouses for his merchandise, claimed denial of equal protection. In rejecting the challenge, the Supreme Court noted the states are subject to the Equal Protection Clause in the exercise of their taxing power but enjoy wide discretion nonetheless. The court observed the Equal Protection Clause "imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation." 358 U.S. at 526. The state taxation scheme must have a rational basis with classifications based on differences having a fair and substantial relation to the object of the legislation. In *Allied Stores of Ohio* the court found "a statute which encourages the location within the State of needed and useful industries by exempting them, though not also others, from its taxes is not arbitrary and does not violate the Equal Protection Clause of the Fourteenth Amendment." 358 U.S. at 528. Other cases also affirm the power of the states to establish classification schemes and grant exemptions. See, *e.g., Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 35 L.Ed.2d 351, 93 S.Ct. 1001

(1973); *Carmichael v. Southern Coal Co.,* 301 U.S. 495, 81 L.Ed. 1245, 57 S.Ct. 868 (1937).

In *Manzanares v. Bell,* 214 Kan. 589, 522 P.2d 1291 (1974), a challenge was made to the constitutionality of the Kansas No-Fault Insurance Act, in part, on equal protection grounds. In the opinion our court said:

"Traditionally, the test utilized in determining if a legislative enactment violates equal protection principles is whether the classification bears a rational relation to the purpose of the legislation. (*Henry v. Bauder,* [213 Kan. 751, 518 P.2d 362]; *Pinkerton v. Schwiethale,* [208 Kan. 596, 493 P.2d 200]; *State v. Consumers Warehouse Market,* 183 Kan. 502, 329 P.2d 638; *McDonald v. Board of Election,* 394 U.S. 802, 22 L.Ed.2d 739, 89 S.Ct. 1404.) The Legislature is presumed to act within its constitutional power despite the fact the application of its laws may result in some inequity. (*McGowan v. Maryland,* 366 U.S. 420, 6 L.Ed.2d 393, 81 S.Ct. 1101.) The equal protection clause goes no further than to prohibit invidious discrimination. (*Williamson v. Lee Optical,* 348 U.S. 483, 99 L.Ed. 563, 75 S.Ct. 461.)" p. 609.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution finds its counterpart in Sections 1 and 2 of the Bill of Rights of the Kansas Constitution which declare respectively that "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness," and that "all free governments . . . are instituted for [the] equal protection and benefit" of the people. These two provisions are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law. *Henry v. Bauder,* 213 Kan. 751, 752-53, 518 P.2d 362 (1974).

Where constitutional challenges have been made to tax exemption schemes as violative of Article 11, Section 1, of the Kansas Constitution, this court has consistently held that the uniform and equal rate of assessment and taxation provision is, in principle and effect, substantially identical to the principle of equality embodied in the Equal Protection Clause of the United States Constitution. *Associated Rly. Equipment Owners v. Wilson,* 167 Kan. 608, 617, 208 P.2d 604 (1949); and *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. 39, 43, 542 P.2d 278 (1975).

The Port Authorities Act as amended in 1981 admittedly establishes a system of taxation favorable to industrial-use facilities, the validity of which depends on the basis of the classification having a fair and substantial relation to the object of the

legislation. The object or purpose of the Act as amended is stated in L. 1981, ch. 76, § 2(*a*) as follows:

"~~There is hereby authorized~~ *It is the purpose of this act to promote, stimulate and develop the general welfare, economic development and prosperity of the state of Kansas by fostering the growth of intrastate and interstate commerce within the state; to promote the advancement and retention of ports within the state; to encourage and assist in the location of new business and industry in this state and the expansion, relocation or retention of existing business and industry when so doing will help maintain existing levels of commerce within the state or increase the movement of commodities, goods and products produced, manufactured or grown within or without the state through existing ports within the state or lead to the development of new ports within the state; and to promote the economic stability of the state by maintaining and providing employment opportunities, thus promoting the general welfare of the citizens of this state, by authorizing port authorities* to be established in each city and in each county of the state~~;~~."

Favorable tax treatment for industrial-use facilities under the Act as amended in 1981 will undoubtedly promote the development of new industries within the state as well as encourage the retention of old and so bears a rational relationship to the otherwise legitimate purpose of the Act. The provision in L. 1981, ch. 76, § 13 which was found valid under Kan. Const. art. 2, § 17, in an earlier part of this opinion gives the same tax treatment to industrial-use facilities commenced prior to April 1, 1981, and bears the same rational relationship to the promotion of the general welfare, economic development, and prosperity of the state. We find no violation of the Equal Protection Clause of the United States Constitution and no violation of equal protection under the Kansas Constitution.

The court finds wholly without merit a contention there has been a denial of due process under the Fourteenth Amendment of the United States Constitution. All parties as well as *amici curiae* have been heard in a full and meaningful manner before this court. The procedural intricacies of this action which detail the opportunities of all interested in these proceedings to be heard by this court are set out in *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 19, 630 P.2d 692 (1981).

Having considered all constitutional attacks made on the Port Authorities Act both before and after the 1981 amendment and having determined them to be without merit, it is to be noted the legislature, in emphasizing economic development as a means of promoting the general welfare of the state, has given that economic development priority as a matter of public policy in the

Act as amended in 1981. To further economic development of the state, the legislature has attempted to provide the most favorable, constitutionally permissible, conditions to attract industry to the state and to retain industrial facilities currently operating in the state. This court is cognizant of the public interest in such economic development.

This court in *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P.2d 71 (1961), found no violation of the Kansas Constitution and no contravention of the public policy of the state in a legislative determination that the encouragement of development of new industry and the relocation or expansion of existing industry through the issuance of industrial revenue bonds, although not available to all industries, serves a legitimate public purpose and advances the general welfare. In addition to the cases cited in *City of Pittsburg,* 188 Kan. at 618, many cases in other jurisdictions have upheld the constitutionality of industrial development schemes founded on encouragement of industry through issuance of industrial revenue bonds. See, *e.g., Opinion of the Justices of Jan. 11, 1962,* 54 Del. 366, 177 A.2d 205 (1962); *Hawkins v. City of Greenfield,* 248 Ind. 593, 230 N.E.2d 396 (1967); *Hebert v. Police Jury of West Baton Rouge Parish,* 200 So. 2d 877 (La. App. 1967); *Gripentrog v. City of Wahpeton,* 126 N.W.2d 230 (N.D. 1964); *Carruthers v. Port of Astoria,* 249 Or. 329, 438 P.2d 725 (1968); *McConnell v. City of Lebanon,* 203 Tenn. 498, 314 S.W.2d 12 (1958); *Development Authority v. Coyner,* 207 Va. 351, 150 S.E.2d 87 (1966).

III.

In the original action in quo warranto brought by Nick A. Tomasic, Wyandotte County District Attorney (relator), the relator's writ of quo warranto was granted. Even though the Port Authorities Act, K.S.A. 12-3401 *et seq.,* itself was found constitutional, the purpose of the Act and the rights and powers of port authorities created under the Act were found limited to a port as defined in K.S.A. 1980 Supp. 12-3401(*f*) which provides: " 'Port' means water port, airport, terminal, land transportation facility or railroad facility." This definitional section clearly describes water, air, or land transportation facilities. The facility proposed in the stipulation of facts is an industrial plant for the assembly of motor vehicles and automotive products with railroad and terminal facilities which would qualify as a port under 12-3401(*f*) to be

developed *incidental* to the industrial facility. Furthermore, the legislative history of the Port Authorities Act does not invite an expansive reading of the definitional section. In the original Act, 12-3401(*f*) defined a "port" as a "water port, airport or land transportation terminal." In the 1980 amendments, "railroad facility" was added. The legislature could also have specified "industrial-use facility" had they intended such facilities to operate as ports under the Act.

The legislative history of the Kansas Port Authorities Act can be traced through documents on file in the office of the Revisor of Statutes. See *State of Kan. ex rel. Stephan v. Adams,* 608 F.2d 861, 865-66 (10th Cir. 1979), *cert. denied sub nom. Spannaus v. Goldschmidt,* 445 U.S. 963 (1980); *State v. Kelly,* 71 Kan. 811, Syl. ¶ 1, 81 Pac. 450 (1905); *City of Topeka v. Gillett,* 32 Kan. 431, Syl. ¶ 2, 4 Pac. 800 (1884). In December of 1967 a member of the House of Representatives requested the Revisor of Statutes to draft a port authority bill for the Committee on Industrial Development. The Kansas Economic Development Commission was primarily interested in this legislation. Accordingly, the Revisor of Statutes drafted 1968 HB 2062, as an adaptation from the Oklahoma comprehensive act on port authorities, Okla Stat. tit. 82, § 1101 *et seq.,* which provides the statutory authority for the Port of Catoosa near Tulsa, Oklahoma. The legislature, however, did not pass HB 2062 in the 1968 session.

The following January the chairman of the House Judiciary Committee requested the Revisor of Statutes to redraft the port authority bill for introduction at the opening of the 1969 session of the legislature. The request stated:

"In drafting the Bill for me, please limit its application in the State to counties 'bordering a navigable stream which forms a part of the boundary of the State of Kansas' or words to this effect so as to limit the application of the Act to those counties in Northeast Kansas which border the Missouri River. I want to localize the Bill in an effort to eliminate some of the opposition to legislation of this type which was expressed by various groups when the Bill was considered in the last Session."

In this historical context L. 1969, ch. 89, the Kansas Port Authorities Act was enacted and signed by the governor. Basically, the 1969 draft, before enactment, was amended to cover the whole state, but the Kansas draft, using the Oklahoma model, was clearly tied to a "Port" as defined in subparagraph "*f*" of K.S.A.

12-3401, as originally enacted. This definition is a new section which cannot be traced to the Oklahoma Act on port authorities.

The court found at 229 Kan. 538 the legislature had failed to provide adequate definitions or guidelines to authorize an industrial-use facility independent of a port as defined in K.S.A. 1980 Supp. 12-3401(*f*).

It is argued before this court that power exists under the Act for a port authority to acquire land for an industrial-use facility. The arguably relevant powers are set out at K.S.A. 1980 Supp. 12-3406(*e*) and (*f*), as follows:

"(*e*) [A]cquire, own, hold, sell, lease, or operate real or personal property for the authorized purposes of the port authority;

"(*f*) acquire, own, maintain, sell, or lease such land within its jurisdiction as it may deem desirable for the development, planning, construction, operation, or leasing of land for industrial use which exercise of such authorization is hereby declared to be for a public purpose."

Although these provisions give port authorities power and authority to acquire land, they must be read in conjunction with the definitional section 12-3401(*f*) which effectively limits the scope of authority to water, air, or land transportation facilities. Legislative intent must be determined from a reading of the Act as a whole. *State ex rel. Stephan v. Martin,* 227 Kan. 456, 462, 608 P.2d 880 (1980).

It is further argued port authorities have the power to construct and equip industrial-use facilities under K.S.A. 1980 Supp. 12-3406(*a*), which gives power to:

"Purchase, construct, sell, lease, and operate docks, wharves, warehouses, piers, and other port, terminal, transportation facilities or railroad facilities within its jurisdiction consistent with the purposes of the port authority . . . ."

Again, this power clearly relates back to and is limited by the definitional section which the court found did not include industrial-use facilities. There is no comparable power given to industrial-use facilities independent of a port.

In the first brief opinion at 229 Kan. 538, the court further found the legislature had failed to provide sufficient guidelines for the issuance of industrial revenue bonds by the port authority to construct and equip an industrial-use facility independent of a port. K.S.A. 1980 Supp. 12-3415 authorizes port authorities to issue negotiable bonds:

"For the purpose of paying all or any part of the cost of acquiring land or interests therein, and the cost of constructing, acquiring, equipping, and furnish-

ing buildings, structures, plants, docks, wharves, warehouses, piers, sidings and other port, terminal, transportation facilities, and railroad facilities or any part thereof . . . ."

The industrial-use facility does not fall within the definition of a "port," and the authorization of 12-3415 goes no further than authorizing issuance of bonds for port-related functions. Although some language read in isolation indicates bonds may be issued to cover the cost of "constructing, acquiring, equipping, and furnishing buildings, structures, plants," that language is qualified by the words "and *other* port, terminal, transportation facilities . . . ." (Emphasis added.) The use of the word "other" cannot be ignored; it clearly indicates the nature of the "buildings, structures, plants" to be financed. *United States v. Standard Brewery,* 251 U.S. 210, 64 L.Ed. 229, 40 S.Ct. 139 (1920).

A final and fatal omission in the proceedings under the Act prior to 1981 lies in the failure of the city of Kansas City, Kansas, to specify the need for an industrial-use facility in the Kansas City, Kansas Port Authority. Ordinance No. 59263, adopted February 1, 1979, and appearing in the Code of Ordinances at Article XVIII, § 2-361 *et seq.,* simply provides:

"**Sec. 2-361. Declaration of necessity.**
"It is hereby declared that there is a need for a port authority to function in the City of Kansas City, Kansas.
"**Sec. 2-362. Established; duties and powers generally.**
"There is hereby established and created in the City of Kansas City, Kansas, a public body corporate and politic, as an agency of the State of Kansas, which shall be known as the Kansas City, Kansas Port Authority, with all the duties and powers provided by K.S.A. 12-3401 to 12-3433, inclusive, as amended, except as such powers and duties are restricted and proscribed by sections 2-364 and 2-365 below."

The omission of industrial-use facilities from the definition of "port" in K.S.A. 1980 Supp. 12-3401(*f*), inadequate definitions and guidelines within the Port Authorities Act prior to 1981 to authorize an industrial-use facility independent of a port, and failure of the creating ordinance to specify the need for an industrial-use facility in the Kansas City, Kansas Port Authority compelled this court to grant relator's writ of quo warranto in *State ex rel. Tomasic v. Kansas City, Kansas Port Authority,* 229 Kan. 538, 626 P.2d 209 (1981).

IV.

On rehearing, as reported in 230 Kan. 19, relator's writ of quo warranto was denied on the basis of actions taken by the Kansas Legislature and the Board of Commissioners of the city of Kansas City, Kansas.

Subsequent to the opinion granting the writ of quo warranto, the legislature amended the Port Authorities Act in many ways material to this case. Infirmities in statutory language which prevented establishment of an industrial-use facility independent of a port under the Port Authorities Act prior to 1981 were corrected in the 1981 amendments. As discussed with particularity in sections I and II of this opinion, the Act as amended in 1981 does not violate provisions of the Kansas Constitution nor of the United States Constitution.

Central to our decision on rehearing are amendments to the definitional section, K.S.A. 1980 Supp. 12-3401. Specifically, the definition of "port" in subsection (f) now includes "industrial-use facility" and new subsection (g) further defines "industrial-use facility." Laws 1981, ch. 76, § 1 provides in pertinent part:

"(f) 'Port means water port, airport, terminal, land transportation facility or railroad facility, airport facility, terminal facility, land transportation facility, railroad facility or industrial-use facility.

"(g) 'Industrial-use facility' means any agricultural, commercial, industrial or manufacturing facility, including the site therefor, which is a part of or contiguous to another port facility or which a port authority determines will further the purposes of this act and will promote the general welfare and economic development of the area of its jurisdiction.

"An agricultural, commercial, industrial or manufacturing facility need not be part of or contiguous to another port facility if the governing body of the city or county creating a port authority also determines that such facility will further the purposes of this act and promote the general welfare and economic development of such city or county."

This amended statute expresses the intention of the legislature to bring industrial-use facilities under the provisions of the Port Authorities Act, and this court must give effect to such an intention plainly and unambiguously expressed. *Lakeview Gardens, Inc. v. State, ex rel. Schneider,* 221 Kan. 211, 557 P.2d 1286 (1976). This court is also mindful that legislative intent can be found in the historical background of an enactment and the circumstances attending its passage. *State, ex rel., v. City of Overland Park,* 215 Kan. 700, 527 P.2d 1340 (1974). The 1981 amendments to the Port Authorities Act which became effective

April 18, 1981, were enacted subsequent to this Court's decision of April 1, 1981, and apparently in response to it.

By redefining "port" to include an "industrial-use facility," the legislature has simultaneously broadened the definition of "port authority," whose powers are delineated in K.S.A. 1980 Supp. 12-3406. However, the validity of actions taken by a port authority in acquiring land for and constructing and equipping an industrial-use facility depends on the interplay of guidelines set out in the Port Authorities Act and the statement of purpose set out by the local governing body in creating the port authority.

Subsection (e) of 12-3406 now appearing in L. 1981, ch. 76, § 4(e) provides a port authority has power and authority to:

"[P]urchase, acquire, own, *maintain, furnish, improve, repair, enlarge, remodel, construct, reconstruct, equip,* hold, sell, lease, or operate real or personal property for the authorized purposes of the port authority *which exercise of such authority is hereby declared to be for a public purpose.*"

The former subsection (f) has been deleted.

A port authority establishing an industrial-use facility not part of or contiguous to another port facility (*e.g.* the General Motors Project) thus has power and authority to purchase land "for the authorized purposes of the port authority." The purposes of the Kansas City, Kansas Port Authority are set out more fully below in Ordinance No. 62827; however, the acquisition of land for the General Motors Plant would fulfill the specific purpose to "encourage and assist in . . . the expansion, relocation and retention of existing business within the City of Kansas City, Kansas" as provided in the Ordinance.

Subsection (a) of 12-3406, now L. 1981, ch. 76, § 4(a), gives a port authority power to:

"Purchase, *acquire,* construct, *reconstruct, improve, equip, furnish, maintain, repair, enlarge, remodel, own,* sell, lease, and operate docks, wharves, warehouses, piers, and other ~~port, terminal, transportation facilities or railroad facilities~~ *water port facilities, airport facilities, terminal facilities, land transportation facilities, railroad facilities or industrial-use facilities* within *the area of* its jurisdiction consistent with the ~~purposes~~ *purpose* of the port authority~~, and to make charges for the use thereof, which shall be not less than the charges established for the same services furnished by a public utility or common carrier in the particular port authority area~~ *which purpose is hereby declared to be for a public purpose;*"

Under this provision, a port authority can construct and equip an industrial-use facility consistent with the purpose of the port authority. Again, the expansion, relocation and retention of existing businesses would be encouraged.

The legislature also amended K.S.A. 1980 Supp. 12-3415 which authorizes port authorities to issue negotiable bonds. Laws 1981, ch. 76, § 11 now provides:

"(*a*) For the purpose of paying all or any part of the cost of *purchasing or* acquiring land or interests therein, and the cost of *purchasing, acquiring,* constructing, ~~acquiring,~~ equipping, *reconstructing, improving, repairing, enlarging, remodeling* and furnishing buildings, structures, plants, docks, wharves, warehouses, piers, sidings and other ~~port, terminal, transportation~~ facilities; ~~and railroad facilities~~ *water port facilities, airport facilities, terminal facilities, land transportation facilities, railroad facilities or industrial-use facilities* or any part thereof; including additions, improvements, relocations, renovations, extensions and modifications thereof (all of which as are included in a single project are hereafter referred to in this act as 'facility or facilities'), a port authority created pursuant to this act, is authorized to borrow money upon credit of the income and revenues to be derived from the operation of such facilities, together with any other available income and revenues from other revenue producing facilities of such port authority, and to issue negotiable bonds of such port authority in such amount as the board of directors of the port authority shall deem necessary for the purpose; and to provide for payment of such bonds and rights of holders thereof as herein provided.

"(*b*) *The port authority shall not issue bonds without first having received approval, by resolution, of the governing body of the city or county which created such port authority. If the port authority was created by two or more cities or counties, the port authority shall not issue such bonds without first having received approval, by resolution, of the governing body of the city or county in which such facility is to be located. Such resolution shall be published once in the official newspaper of the approving city or county.*"

Subsection (*a*) enlarges the purposes for which bonds may be issued to include purchase of land, a provision that encompasses the General Motors Project. More detailed means of providing physical facilities are set out and, most important, industrial-use facilities are specifically included. Subsection (*b*) requires approval of bond issuance by the governing body which created the port authority.

In response to these legislative amendments, the Board of Commissioners of the city of Kansas City, Kansas amended Article XVIII of its Code of Ordinances to broaden the statement of need for the Kansas City, Kansas Port Authority consistent with the Act as amended in 1981. Ordinance No. 62827, adopted April 20, 1981, reads:

"It is hereby declared that there is a need for the Kansas City, Kansas Port Authority to function in the City of Kansas City, Kansas, to promote, stimulate and develop the economic development and prosperity of the City of Kansas City, Kansas, and of the State of Kansas, by fostering the growth of intrastate and

interstate commerce therein; to promote the advancement and retention of ports and port facilities within the City of Kansas City, Kansas, and the State of Kansas; to encourage and assist in the location of new business and industry and the expansion, relocation and retention of existing business within the City of Kansas City, Kansas, and the State of Kansas to further the purposes of maintaining existing levels of commerce therein or increasing such commerce through existing ports therein or developing new ports; and to promote the economic stability of the City of Kansas City, Kansas, and the State of Kansas by maintaining and providing employment opportunities therein. Such need includes the advancement of agricultural, commercial, industrial and manufacturing facilities which are part of or contiguous to other port facilities or which are determined by resolution of the governing body of the City of Kansas City, Kansas, to be in furtherance of the purposes of K.S.A. § 12-3401 to § 12-3433, inclusive, as amended, and appropriate for the promotion of the general welfare and economic development of the City of Kansas City, Kansas, in accordance with K.S.A. 12-3401(g), as amended."

Based on this declaration of need, it was within the power of the Board of Commissioners to determine the General Motors Project would contribute directly to the economic development and prosperity of the city of Kansas City, Kansas, and of the State of Kansas through the specific means enumerated.

On April 21, 1981, the Board of Commissioners adopted Resolution No. 33724: (a) determining a need for, and authorizing the respondent to proceed with, the acquisition, construction and equipping of the General Motors Project, including the site therefor; and (b) approving of and authorizing the issuance of one or more series of revenue bonds by the respondent in an aggregate amount not to exceed $500 million for the purpose of financing the project. Because the proceedings for this industrial-use facility commenced prior to April 1, 1981, the Commissioners could have approved the project based solely on the proposed cost under L. 1981, ch. 76, § 1(g); however, they also considered the factor test for industrial-use facilities not part of or contiguous to another port facility and determined the General Motors Project would further the purposes of the Port Authorities Act and promote the general welfare and economic development of the city of Kansas City, Kansas, and the State of Kansas. In the foregoing actions, the Board of Commissioners declared a need for industrial-use facilities within the Kansas City, Kansas Port Authority and implicitly ratified prior actions taken by the Port Authority in approving the General Motors Project.

In light of the actions taken by the Kansas Legislature and the Board of Commissioners of the city of Kansas City, Kansas,

subsequent to April 1, 1981, the relator's writ of quo warranto was denied at 230 Kan. 19.

V.

The issue of the tax exempt status of the General Motors Project under the Act as amended in 1981 has not heretofore been addressed by the court and merits discussion. The issue was raised in the original action in quo warranto, but the court did not reach it in the opinion at 229 Kan. 538 because the port authority was found without authority to engage in the development of an industrial-use facility.

K.S.A. 1980 Supp. 12-3418 provided "no port authority shall be required to pay any taxes or assessments upon any property acquired and used by it under the provisions of this act." In L. 1981, ch. 76, § 13 the legislature amended this provision to read "property acquired and used by it *or leased to another.*" (Emphasis added.) An agreement designated a "lease agreement" exists between the Kansas City, Kansas Port Authority and General Motors and constitutes a possible basis for tax exemption.

It is contended the provision giving GM an option to purchase for a nominal sum makes the agreement an executory contract for sale rather than a lease and, therefore, disqualifies the project from exemption as a "lease." The principles enunciated in two older tax cases are helpful in determining the tax status of the instant agreement.

In *Brown v. Thomas, Sheriff,* 37 Kan. 282, 15 Pac. 211 (1887), an action to enjoin collection of taxes on agreements for sale of real estate, the court found an agreement to sell "upon the strict performance of the conditions of this contract" (p. 283) conveyed neither legal nor equitable title. Legal title had not passed because no deed or conveyance had been made; equitable title had not passed because the land had not been paid for and the forfeiture provisions clearly indicated the intention of the parties that title should not pass until payment. The vendor still owned the land and could not be taxed on the land contract.

In *Kansas Power Co. v. Smith County Comm'rs,* 122 Kan. 252, 251 Pac. 1114 (1927), an action to enjoin collection of tax to the full extent of value of an electric-power plant sold by the city to plaintiff's predecessor in interest, the court followed *Brown* and found the provisions of the contract prevented either legal or

equitable title from passing until full payment. The court further found the general rule unaffected by the fact the ordinance was to operate as a conveyance upon fulfillment of the terms of the contract.

The agreement between General Motors and the Kansas City, Kansas Port Authority vests legal title in the respondent subject to the lease and indenture. Lease Agreement, Section 4.8. *Only* after the bonds are redeemed can General Motors exercise its option to purchase and have title conveyed. Lease Agreement, Section 11.2. Any default as defined in Section 12.1 of the agreement gives the Port Authority discretion to elect among remedies outlined in Section 12.2, including acceleration of bond payments, written notice to terminate the lease subject to 30-day cure, and re-entry without termination of the lease. Under the latter two remedies, the property reverts to the Port Authority. Lease Agreement, Section 10.2. Clearly, General Motors' possession and eventual purchase of the property depend on fulfillment of terms of the agreement. (The foregoing sections of the lease agreement appear as an appendix to this opinion.)

Although there is no explicit provision in the agreement making time of the essence, a time framework is imposed by the revenue bond schedules which accompany the project. Further provision would have been superfluous. *Pickens v. Campbell,* 104 Kan. 425, 179 Pac. 343 (1919).

"Lease" language is used throughout the agreement and, while this court is not bound by the terminology chosen by the parties, it was clearly the intent of the parties to enter a lease agreement under the terms of L. 1981, ch. 76, § 13. References to "purchase" and "option to purchase" are subordinate to the terms of the lease itself. Nothing in the exemption language of § 13 restricts the exemption to an industrial-use facility built and operated under a standard lease agreement rather than a lease-purchase agreement. We decline to interpret the language so narrowly. The purchase provision of the lease is a necessary incident to effect the intended purpose of the Act to encourage the location of new industry within the state and the retention of old. Because we find the agreement valid as a lease under § 13, we need not reach the question whether the property is "acquired and used" by the Port Authority.

In the briefs and arguments before this court, the parties cited

*State ex rel. Cartwright v. Dunbar,* 618 P.2d 900 (Okla. 1980), a case which found a purported lease agreement in a situation similar to the one at bar to be an executory contract for sale under Oklahoma law. We have considered the case but find it inapplicable since the validity of the tax exemption in Kansas rests on interpretation of the Kansas Constitution and the applicable legislative enactments heretofore discussed.

VI.

In concluding this opinion, we will not attempt to summarize the procedural intricacies or the substantive holdings in the case but refer to our two prior opinions reported at 229 Kan. 538 and 230 Kan. 19, for the court's judgment.

FROMME, J., not participating.

Pursuant to Article 3, section 6(f) of the Constitution of the State of Kansas, the Honorable William D. Clement, judge of the district court of the 8th Judicial District was assigned by the Chief Justice to participate in this court's decision in the foregoing case, *vice* Fromme, J.

APPENDIX

Selected sections of the lease agreement between the Kansas City, Kansas Port Authority and General Motors Corporation:

ARTICLE IV

PURCHASE AND CONSTRUCTION OF THE PROJECT

Section 4.8. Project Property of Issuer. The Project, all Project Improvements and Project Equipment located thereon at the execution hereof and which the Company desires to convey to the Issuer, all work and materials on the Project Improvements as such work progresses, the Project Equipment, and all additions or enlargements thereto or thereof, the Project as fully completed, anything under this Lease which becomes, is deemed to be, or constitutes a part of the Project, and the Project as repaired, rebuilt, rearranged, restored or replaced by the Company under the provisions of this Lease, except as otherwise specifically provided herein, shall immediately when erected or installed become the absolute property of the Issuer, subject only to this Lease and the Indenture.

ARTICLE X

SPECIAL COVENANTS

Section 10.2. Surrender of Possession. Upon accrual of the

Issuer's right of re-entry because of the Company's default hereunder or upon the cancellation or termination of this Lease for any reason other than the Company's purchase of the Project pursuant to Article X hereof, the Company shall peacefully surrender possession of the Project to the Issuer in good condition and repair, ordinary wear and tear excepted . . . .

## ARTICLE XI
## COMPANY'S OPTION AND OBLIGATION TO PURCHASE THE PROJECT

Section 11.2. Option to Purchase the Project. The Company shall have, and is hereby granted, the option to purchase the Project at any time, prior to the expiration of the Lease Term upon payment in full of all Bonds then outstanding or provision for their payment having been made pursuant to Article XIII of the Indenture. To exercise such option the Company shall give written notice to the Issuer and to the Trustee, if any of the Bonds shall then be unpaid or provision for their payment shall not have been made in accordance with the provisions of the Indenture, and shall specify therein the date of closing such purchase, which date shall be not less than 45 nor more than 90 days from the date such notice is mailed, and in case of a redemption of the Bonds in accordance with the provisions of the Indenture the Company shall make arrangements satisfactory to the Trustee for the giving of the required notice of redemption. The purchase price payable by the Company in the event of its exercise of the option granted in this Section shall be the sum of the following:

(a) an amount of money which, when added to the amount then on deposit in the Bond Fund, will be sufficient to redeem all the then outstanding Bonds on the earliest redemption date next succeeding the closing date, including, without limitation, principal, premium, if any, and interest to accrue to said redemption date and redemption expense; plus

(b) an amount of money equal to the Trustee's and Paying Agents' fees and expenses under the Indenture accrued and to accrue until such redemption of the Bonds; plus

(c) the sum of $100.

## ARTICLE XII
## DEFAULT AND REMEDIES

Section 12.1. Events of Default. If any one or more of the following events shall occur and be continuing, it is hereby

defined as and declared to be and to constitute an "event of default" or "default" under this Lease:

(a) Default in the due and punctual payment of Basic Rent or Additional Rent; or

(b) Default in the due observance or performance of any other covenant, agreement, obligation or provision of this Lease on the Company's part to be observed or performed, and such default shall continue for 30 days after the Issuer or the Trustee has given the Company written notice specifying such default (or such longer period as shall be reasonably required to cure such default; provided that (i) the Company has commenced such cure within said 30-day period, and (ii) the Company diligently prosecutes such cure to completion); or

(c) The Company shall:

(i) admit in writing its inability to pay its debts as they become due; or

(ii) file a petition in bankruptcy or for reorganization or for the adoption of an arrangement under the Bankruptcy Act as now or in the future amended, or file a pleading asking for such relief; or

(iii) make an assignment for the benefit of creditors; or

(iv) consent to the appointment of a trustee or receiver for all or a major portion of its property; or

(v) be finally adjudicated as bankrupt or insolvent under any federal or state law; or

(vi) suffer the entry of a final and nonappealable court order under any federal or state law appointing a receiver or trustee for all or a major part of its property or ordering the winding-up or liquidation of its affairs, or approving a petition filed against it under the Bankruptcy Act, as now or in the future amended, which order, if not consented to by it, shall not be vacated, denied, set aside or stayed within 60 days after the day of entry; or

(vii) suffer a writ or warrant of attachment or any similar process to be issued by any court against all or any substantial portion of its property, and such writ or warrant of attachment or any similar process is not contested, stayed, or is not released within 60 days after the final entry, or levy or after any contest is finally adjudicated or any stay is vacated or set aside;

Section 12.2. Remedies on Default. If any event of default referred to in Section 11.1 hereof shall have occurred and be continuing, then the Issuer may at the Issuer's election (subject, however, to any restrictions against acceleration of the maturity of the Bonds or termination of this Lease in the Indenture), then or at any time thereafter, and while such default shall continue, take any one or more of the following actions:

(a) cause all amounts payable with respect to the Bonds for the remainder of the term of the Lease to become due and payable, as provided in the Indenture;

(b) give the Company written notice of intention to terminate this Lease on a date specified therein, which date shall not be earlier than 30 days after such notice is given, and if all defaults have not then been cured, on the date so specified, the Company's rights to possession of the Project shall cease and this Lease shall thereupon be terminated, and the Issuer may re-enter and take possession of the Project; or

(c) without terminating this Lease, re-enter the Project or take possession thereof pursuant to legal proceedings or pursuant to any notice provided for by law, and having elected to re-enter or take possession of the Project without terminating this Lease, the Issuer shall use reasonable diligence to relet the Project, or parts thereof, for such term or terms and at such rental and upon such other terms and conditions as the Issuer may deem advisable, with the right to make alterations and repairs to the Project, and no such re-entry or taking of possession of the Project by the Issuer shall be construed as an election on the Issuer's part to terminate this Lease, and no such re-entry or taking of possession by the Issuer shall relieve the Company of its obligation to pay Basic Rent or Additional Rent (at the time or times provided herein), or of any of its other obligations under this Lease, all of which shall survive such re-entry or taking of possession, and the Company shall continue to pay the Basic Rent and Additional Rent provided for in this Lease until the end of the Lease Term, whether or not the Project shall have been relet, less the net proceeds, if any, of any reletting of the Project after deducting all of the Issuer's reasonable expenses in or in connection with such reletting, including without limitation all repossession costs, brokerage commissions, legal expenses, expenses of employ-

ees, alteration costs and expenses of preparation for reletting. Said net proceeds of any reletting shall be deposited in the Bond Fund. Having elected to re-enter or take possession of the Project without terminating this Lease, the Issuer may (subject, however, to any restrictions against termination of this Lease in the Indenture), by notice to the Company given at any time thereafter while the Company is in default in the payment of Basic Rent or Additional Rent or in the performance of any other obligation under this Lease, elect to terminate this Lease on a date to be specified in such notice, which date shall be not earlier than 30 days after re-entry under (c) above, and if all defaults shall not have then been cured, on the date so specified this Lease shall thereupon be terminated. If in accordance with any of the foregoing provisions of this Article the Issuer shall have the right to elect to re-enter and take possession of the Project, the Issuer may enter and expel the Company and those claiming through or under the Company and remove the property and effects of both or either (forcibly if necessary) without being guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or preceding breach of covenant. The Issuer may take whatever action at law or in equity which may appear necessary or desirable to collect rent then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Company under this Lease.