No. 81,074

STATE OF KANSAS *ex rel.* NICK A. TOMASIC, WYANDOTTE COUNTY DISTRICT ATTORNEY, *Relator*, v. THE UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS, *Respondent.*

(962 P.2d 543)

780

Opinion filed July 10, 1998.

*Nick A. Tomasic*, district attorney, and *Michael P. Howe* and *Thomas M. Martin*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, argued the cause and were on the brief for relator.

*N. Cason Boudreau*, deputy chief counsel of Unified Government of Wyandotte County/Kansas City, argued the cause, and *Harold T. Walker*, chief counsel, and *Stephen P. Chinn*, *T. Chris Williams*, and *David W. Bushek*, of Stinson, Mag & Fizzell, P.C., of Kansas City, Missouri, were with him on the brief for respondent.

*Joseph R. Borich, III*, argued the cause, and *Douglas J. Patterson*, of Leawood, was with him on the brief for *amicus curiae* Property Owners.

The opinion of the court was delivered by

ABBOTT, J.: This is an original proceeding in quo warranto. The action was filed by Wyandotte County District Attorney Nick Tomasic, seeking rulings concerning the proposed construction of an auto race track facility and related projects in Wyandotte County. Respondent is the Unified Government of Wyandotte County/ Kansas City, Kansas.

In general, relator seeks (1) a determination that some of the amendments to the urban redevelopment statutes, K.S.A. 12-1770 *et seq.*, (also sometimes referred to as the tax increment financing statutes) contained in L. 1998, ch. 17 are unconstitutional, (2) an

order prohibiting the Unified Government from exercising its powers under those amendments to develop the proposed auto race track facility and related projects within Wyandotte County, (3) a determination that certain provisions found in the Development Agreement (Agreement) between Kansas International Speedway Corporation and the Unified Government violate the State's Cash Basis Law as well as the full faith and credit provision found in L. 1998, ch. 17, § 3, and (4) a determination that the Unified Government has been acting in violation of state law by acquiring interests in real property in furtherance of the auto race track redevelopment project prior to the adoption of a redevelopment plan and a relocation assistance plan.

## FACTS

The facts involving recent preparations for this proposed auto race track facility are not in dispute and were presented by the parties in a stipulation of facts and agreed-upon record. In early 1997, International Speedway Corporation (ISC) approached the City of Kansas City, Kansas, the predecessor of the Unified Government of Wyandotte County/Kansas City, Kansas (Unified Government), and expressed an interest in constructing a super speedway auto race track facility within its jurisdictional boundaries. Following several meetings between the representatives of the Unified Government and ISC, ISC created a wholly owned Kansas subsidiary corporation named Kansas International Speedway Corporation (KISC).

KISC and the Unified Government entered into the Agreement on December 16, 1997, which established a plan for the development of the auto race track facility. The Agreement set forth the obligations of the parties; established dates for accomplishing certain actions in furtherance of the project; contained covenants, warranties, and conditions precedent; and established termination rights, events of default, and remedies for breach of the Agreement. One of the conditions precedent was the adoption of a tax increment financing plan. Another was the requirement that certain portions of the urban redevelopment/tax increment financing statutes be amended. Among other things, these statutes authorize

cities to exercise specified redevelopment powers in designated areas, including areas designated by the Secretary of the Kansas Department of Commerce and Housing (KDOCH) as major tourism areas of the State. Financing of the auto race track facility was to proceed, in large part, pursuant to these statutes.

The Agreement also provided for the formation of a committee to establish procedures for the acquisition of property interests necessary for the project and gave the committee the authority to hire an acquisition/relocation consultant. The committee consists of two representatives from KISC and two representatives of the Unified Government. The Agreement also provided for the establishment of an escrow account to pay certain costs incurred in connection with the project prior to the issuance of special obligation bonds. KISC, the Unified Government, and the State of Kansas pooled certain funds together in the escrow account. The escrow funds, although separated for accounting purposes, have been commingled and have been used for pre-acquisition services, such as appraisal and title work. Although a final redevelopment plan has not been approved, money from the pooled account has been transferred to a title company and will be used to pay homeowners upon their execution of a contingent real estate contract. For internal accounting purposes, funds taken from the pooled account to pay for such option contracts were assessed against KISC's contribution to the joint funds.

During the 1998 legislative session, the legislature amended portions of the urban redevelopment statutes. The amended statutes became law when published in the Kansas Register on February 26, 1998.

In general, and as relevant to the matter at hand, the amendments to the urban redevelopment statutes contained in L. 1998, ch. 17 do the following:

(1) state that one of the purposes of the urban redevelopment statutes is to assist in the redevelopment of a "major tourism area," as that term is defined in L. 1998, ch. 17, § 3(a)(1)(D);

(2) establish the boundaries for a redevelopment district in Wyandotte County that will contain an auto race track facility; require completion of the redevelopment project connected with the auto

race track facility within 30 years; extend from 20 to 30 years the maximum maturity of special obligation bonds issued to finance an auto race track facility; provide for an exemption from property taxation for all property, both real and personal, constituting an auto race track facility for a period of 30 years, if certain determinations are made by the city; and allow the inclusion within a major tourism area of an additional 400 acres of property for development, upon certain findings by the Governor and subject to certain rules (L. 1998, ch. 17, § 2, amending various subsections of K.S.A. 1997 Supp. 12-1771);

(3) allow the Secretary of KDOCH to find that a redevelopment project will create a major tourism area of the state if the redevelopment project will consist of at least $100 million in capital improvements and the project constructed will be an auto race track facility (thereby setting the stage for tax increment financing of the project through issuance of special obligation bonds); and define the term "auto race track facility" (L. 1998, ch. 17, § 3, amending various subsections of K.S.A. 1997 Supp. 12-1774);

(4) specify that, prior to the exercise of eminent domain power, "the city shall offer to the owner of any property which will be subject to condemnation with respect to any redevelopment project, other than one which includes an auto race track facility, compensation in amount equal to the highest appraised valuation amount determined for property tax purposes by the county appraiser for any of the three most recent years next preceding the year of condemnation" and, upon condemnation, an additional amount equal to 25% of the condemnation or damage award (L. 1998, ch. 17, § 5, amending subsection [a] of K.S.A. 1997 Supp. 12-1773); and

(5) specify that relocation assistance payments, with respect to any redevelopment project other than one which includes an auto race track facility, shall not be less than $500 (L. 1998, ch. 17, § 6, amending K.S.A. 12-1777).

The statutes which are the primary focus of this action are as follows:

L. 1998, ch. 17, § 2(e), amending K.S.A. 1997 Supp. 12-1771(e) and setting boundaries of the major tourism area.

L. 1998, ch. 17, § 2(h), amending K.S.A. 1997 Supp. 12-1771(h) and setting a 30-year maximum period for special obligation bonds for an auto race track facility.

L. 1998, ch. 17, § 2(l), amending K.S.A. 1997 Supp. 12-1771(l) and allowing for the development of an additional 400 acres upon findings by the Governor.

L. 1998, ch. 17, § 5, amending K.S.A. 1997 Supp. 12-1773 and requiring adoption of a redevelopment plan prior to acquisition of property and imposing a 25% premium requirement.

L. 1998, ch. 17, § 3(a)(1)(D), amending K.S.A. 1997 Supp. 12-1774(a)(1)(D) and indicating an auto race track facility may be a major tourism area of the state and requiring findings by the Secretary of KDOCH.

L. 1998, ch. 17, § 3(b)(1), amending K.S.A. 1997 Supp. 12-1774(b)(1) and prohibiting the issuance of full faith and credit bonds for a major tourism area.

L. 1998, ch. 17, § 6, amending K.S.A. 12-1777 and requiring adoption of a relocation assistance plan prior to initiation of the redevelopment project.

On March 5, 1998, the Unified Government adopted Resolution R-17-98 pursuant to K.S.A. 1997 Supp. 12-1771(a), as amended, designating the area in Wyandotte County within the following boundaries as a major tourism area:

Beginning at the intersection of Interstate 70 and Interstate 435; west along Interstate 70 to 118th Street; north along 118th Street to State Avenue; northeasterly along proposed relocated State Avenue to 110th Street; north along 110th Street to Parallel Parkway; east along Parallel Parkway to Interstate 435; south along Interstate 435 to Interstate 70.

These boundaries coincide with the boundaries established by L. 1998, ch. 17, § 2(e).

Part of the Unified Government's resolution also requested the Secretary of KDOCH to approve this area, pursuant to L. 1998, ch. 17, § 3(a)(1)(D), as a major tourism area of the state.

Also on March 5, 1998, the Unified Government set a March 19, 1998, date for a public hearing to consider the establishment of a "Prairie-Delaware Redevelopment District" in the area it had

designated as a major tourism area. The Redevelopment District was to include the proposed auto race track facility site, a proposed multi-use 400 acre parcel of land adjacent to and towards the north and east of the proposed auto race track site, and a small section of residential land adjacent to and towards the southwest of the race track site.

On March 19, 1998, pursuant to L. 1998, ch. 17, § 3(a)(1)(D), the Secretary of KDOCH found that the proposed redevelopment area, *i.e.*, the area designated by the Unified Government as a major tourism area, was also a major tourism area of the state. The same day, the Governor, pursuant to L. 1998, ch. 17, § 2(l), found that the development plan and each project within the additional 400-acre area of the proposed Redevelopment District, excluding roads and highways, would enhance the major tourism area of the state.

At the conclusion of its March 19, 1998, public hearing, the Unified Government adopted a resolution finding that the Redevelopment District was within the major tourism area of the state. (Resolution R-24-98.) The Unified Government, in accordance with L. 1998, ch. 17, § 2(e), then passed Ordinance No. O-11-98, which established the Redevelopment District. The boundaries of the Redevelopment District are coterminous with the boundaries of the major tourism area of the state.

On April 15, 1998, the acquisition/relocation consultant, nominally on behalf of KISC, began making real estate offers to property owners within the Redevelopment District to privately acquire an option to purchase their properties. The offers include, in addition to the amount specified by L. 1998, ch. 17, § 5(a) that would be awarded if the properties were condemned, the 25% additional amount established by L. 1998, ch. 17 for owners whose property is condemned as the result of the construction of an auto race track facility. The offers also include an incentive fee that differs in value based on the category of owner or occupant to whom the offer is made and when the offer is accepted.

Shortly after the acquisition/relocation consultant began making real estate offers in furtherance of the project, relator filed his petition for writ of quo warranto, asking this court to exercise its

original jurisdiction and determine the several issues presented in this case. In support, relator asserted the need for an early, immediate, and final resolution by this court of the important legal issues presented and noted the importance of the questions relative to displacement of residents in the proposed redevelopment area and to the economic growth and development of the City of Kansas City, Wyandotte County, and the entire state of Kansas. After consideration of the petition and memorandum in support, this court, as a matter of discretion, consented to hear and determine these issues.

## STANDARD OF REVIEW

Some of the general rules of state constitutional construction were recently reiterated in *State ex rel. Stephan v. Parrish*, 257 Kan. 294, 297-98, 891 P.2d 445 (1995) (quoting *State ex rel. Schneider v. Kennedy*, 225 Kan. 13, 20-21, 587 P.2d 844 ([1978]):

" 'It is fundamental that our state constitution limits rather than confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby. [Citations omitted.]

" 'The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. [Citations omitted.]

" 'In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [Citations omitted.]

" 'Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. [Citations omitted.]

" 'Courts do not strike down legislative enactments on the mere ground they fail to conform with a strictly legalistic definition o[r] technically correct interpretation of constitutional provisions. The test is rather whether the legislation conforms with the common understanding of the masses at the time they adopted such provisions and the presumption is in favor of the natural and popular meaning in which the words were understood by the adopters. [Citations omitted.]

" 'The propriety, wisdom, necessity and expedience of legislation are exclusively matters for legislative determination and courts will not invalidate laws, otherwise constitutional, because the members of the court do not consider the statute in the public interest of the state, since, necessarily, what the views of members of the court may be upon the subject is wholly immaterial and it is not the province nor the right of courts to determine the wisdom of legislation touching the public

interest as that is a legislative function with which courts cannot interfere. [Citations omitted.]' "

## 1. Public Purpose

Initially, the relator contends that the development of an auto race track facility is not a valid public purpose for which tax increment financing (TIF) bonds and special obligation (STAR) bonds, issued pursuant to K.S.A. 12-1774(a)(1), may be issued and for which eminent domain authority may be exercised. If, however, the purpose is found to be a valid public purpose, the relator contends that the issuance of such bonds and the exercise of eminent domain authority for such a purpose are nevertheless unconstitutional, as violative of the Equal Protection Clauses of both the Kansas and United States Constitutions, because (1) there is no rational basis for limiting the "major tourism of the State" classification to the development of an auto race track facility in Wyandotte County to the exclusion of other forms and locations of tourism, (2) there is no rational basis for allowing special obligation bonds used solely to finance an auto race track facility to have a maximum maturity of 30 years while limiting other urban redevelopment special obligation bonds to a maximum maturity of 20 years, and (3) the amendments contained in L. 1998, ch. 17 fail to provide sufficient standards for the Governor to make appropriate determinations regarding either the economic feasibility of the project or the enhancement of a major tourism area.

Relator argues that this auto race track redevelopment project has no valid public or governmental purpose because it amounts to nothing more than a private entity, *i.e.*, KISC, cloaking itself with vestiges of eminent domain authority to benefit its own financial well-being. Relator further argues the government has no purpose or compelling reason for its involvement in this area.

This court has held that there is no precise definition of what constitutes a valid public use, and what may be considered a valid public use or purpose changes over time. *Ullrich v. Board of Thomas County Comm'rs*, 234 Kan. 782, 789, 676 P.2d 127 (1984). Further, this court has noted that as long as a governmental action is designed to fulfill a public purpose, the wisdom of the govern-

mental action generally is not subject to review by the courts. *Duckworth v. City of Kansas City*, 243 Kan. 386, 389, 758 P.2d 201 (1988).

In *Mid-America Pipeline Co. v. Lario Enterprises*, 716 F. Supp. 511 (D. Kan. 1989), *rev'd on other grounds* 942 F.2d 1519 (10th Cir. 1991), the United States District Court for the District of Kansas found that the taking of private property for use as an auto race track facility was a valid public purpose:

"Plaintiff has suggested that eminent domain does not apply to these facts because [Heartland Park Topeka - the motor sports racing facility] does not constitute a public use of land. In this connection, plaintiff notes the substantial private interest of defendant Lario in the project. The court disagrees with plaintiff's contention for two reasons. First, the City has a major interest in this project. . . . Second the development of recreational facilities and the facilitation of economic development in partnership with private enterprise have been considered legitimate public purposes for the exercise of eminent domain and the expenditure of public money. See *Ottawa Hunting Ass'n v. State, supra,* 289 P.2d at 758 (condemnation of private property for fish and game preserve considered an effort to improve recreational facilities for state's citizens); *Duckworth v. City of Kansas City*, 243 Kan. 386, 758 P.2d 201 (1988) (loan from city to private developer to remodel downtown building promotes public purpose of economic revitalization); *State v. City of Topeka*, 176 Kan. 240, 270 P.2d 270 (1954) (city may condemn land for parking facility and lease the facility to a private corporation); *Frum v. Little Calumet River Basin Development Authority*, 518 N.E.2d 809, 811 (Ind. App. 1988) (eminent domain approved for construction of marina to be leased to a private party); *State v. Daytona Beach Racing & Recreational Facilities Dist.*, 89 So. 2d 34 (Fla. 1956) (bond money for racetrack to be operated by private corporation not less than six months a year for 40 years furthers public purposes of increasing trade and providing recreation)." 716 F. Supp. at 517-18.

In *State, ex rel., Fatzer v. Urban Renewal Agency of Kansas City*, 179 Kan. 435, 438, 296 P.2d 656 (1956), this court stated:

"It is elementary that the legislature possesses no power to authorize the appropriation of one's property for a private use or purpose, but it is equally well-settled that the right to take private property for a public use is inherent in the state, and that the legislature may authorize the acquisition and appropriation of private property for a public use provided the owner is compensated therefor. [Citation omitted.] The difficulty often encountered lies in the inability of courts comprehensively to define the concept of a public use or purpose, due, no doubt, to the exigencies shown by the facts and the diversity of local conditions and circumstances in an everchanging world.

"In our opinion the concept of the terms public purpose, public use, and public welfare, as applied to matters of this kind, must be broad and inclusive. . . . The mere fact that through the ultimate operation of the law the possibility exists that some individual or private corporation might make a profit does not, in and of itself, divest the act of its public use and purpose."

We hold the development of the auto race track facility and related projects are valid public purposes for which TIF and STAR bonds may be issued and eminent domain authority exercised.

## 2. Major Tourism Area of the State

Relator next argues there is no rational basis for limiting the major tourism area of the state classification to the development of an auto race track facility to the exclusion of other forms and locations of tourism. In order for the Unified Government to issue bonds for this project, the Secretary of KDOCH must find that the project will create a "major tourism area within the state." L. 1998, ch. 17, § 3(a)(1)(D) in part provides:

"In making a finding that a redevelopment project will create a major tourism area within the state, the secretary must conclude at least: (i) That capital improvements costing not less than $100,000,000 will be built in the state to construct a project for such major tourism area; and (ii) that the project constructed will be an auto race track facility. An auto race track facility means (i) an auto race facility and facilities directly related and necessary to the operation of an auto race track facility including, but not limited to, grandstands, suites and viewing areas, concessions and souvenir facilities, catering facilities, visitor and retail centers, signage and temporary hospitality facilities; but excluding (ii) hotels, motels, restaurants and retail facilities not included in (i)."

Relator argues that because this statute limits a redevelopment project, based on a characterization that the area is a major tourism area of the state, to the development of this particular auto race track facility in Wyandotte County, it violates the equal protection requirements of both the United States and Kansas Constitutions because there is no reasonable or rational basis for such a limitation. Relator further argues that the limitation establishes an improper distinction between the promotion of this particular auto race track facility and any other auto race track facility or potential major tourism area that could be developed in other areas of the state.

The issue here is not whether there is a rational basis for the exclusion of certain forms of tourism from the definition of a "major tourism area" but, instead, whether the classification established by the legislature's inclusion of auto race track facilities in the definition of a major tourism area bears a rational relationship to the purpose of the legislation. Encouraging the location of auto race track facilities in the state of Kansas will, in fact, promote, stimulate, and develop the economic welfare of the state and its communities and assist in the development and redevelopment of major tourism areas, both of which are purposes of the urban redevelopment statutes. There is no equal protection violation merely because incentives for other segments of the tourism industry would also rationally relate to the purposes of the urban redevelopment statutes. Relator misconstrues the amendments contained in L. 1998, ch. 17 because the amendments do not distinguish between this proposed auto race track facility and any other auto race track facility or potential major tourism area that could be developed in other areas of the state.

We hold the inclusion of an auto race track facility in the definition of a "major tourism area" bears a rational relationship to the furtherance of the economic development of the state. The amendments do not make a distinction between an auto race track facility in Wyandotte County and one in another area of the state.

### 3. The Bonds

Relator next argues another improper distinction results due to the following language of L. 1998, ch. 17, § 2(h):

"The maximum maturity on bonds issued to finance projects pursuant to this act shall not exceed 20 years except that: (1) Such maximum period of special obligation bonds not payable from revenues described by subsection (a)(1)(D) of K.S.A. 12-1774, and amendments thereto issued to finance an auto race track facility shall not exceed 30 years; and (2) such maximum period, if the governor determines and makes and submits a finding to the speaker of the house of representatives and the president of the senate that a maturity greater than 20 years, but in no event exceeding 30 years, is necessary for the economic feasibility of the financing of an auto race track facility with special obligation bonds payable primarily from revenues described by subsection (a)(1)(D) of K.S.A. 12-1774, and amendments thereto, may be extended in accordance with such determination and finding."

The amendment allows a 30-year repayment period for special obligation bonds issued to finance an auto race track facility. Other urban redevelopment special obligation bonds, however, must be repaid in 20 years.

According to relator, the maximum maturity distinction between bonds financing an auto race track facility and all other bonds is wholly arbitrary and exclusive to this particular auto race track facility. Further, relator argues, the rationale for such a distinction, *viz.*, economic feasibility, is nonsensical because any project with a longer payout period, *e.g.*, 30 years versus 20 years, always has the opportunity to become more economically feasible. A longer payout period allows for a lower annual payment to bondholders, a longer period of time to achieve financial success, and the potential to enhance economic performance over the life of the bonds.

As a type of tourism, race track facilities provide unique economic benefits to a state. The legislature has found, based on the provisions of L. 1998, ch. 17, § 2(h), that the extension of time for bond repayment for auto race track facilities will encourage the location of such facilities in the state and thereby produce economic benefits to the state and its communities while encouraging the development and redevelopment in major tourism areas. The fact that similar extensions of time for repayment are not granted to other types of tourism does not violate equal protection requirements.

The United States Supreme Court has described the extremely deferential standard used to analyze alleged equal protection violations:

"Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. [Citations omitted.] Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.' [Citation omitted.] This standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified

by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313-14, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1993).

We previously have articulated the standard that governs judicial review of alleged violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and §§ 1 and 2 of the Kansas Constitution Bill of Rights:

" 'Traditionally, the test utilized in determining if a legislative enactment violates equal protection principles is whether the classification bears a rational relation to the purpose of the legislation. [Citations omitted.] The Legislature is presumed to act within its constitutional power despite the fact the application of its laws may result in some inequity. [Citation omitted.] The equal protection clause goes no further than to prohibit invidious discrimination. [Citation omitted.]' " *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981) (quoting *Manzanares v. Bell*, 214 Kan. 589, 609, 522 P.2d 1291 [1974]).

" ' "A statutory discrimination will not be set aside if *any state of facts* reasonably may be conceived to justify it." ' " (Emphasis added.) *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, 30, 643 P.2d 87 (1992) (quoting *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 616, 576 P.2d 221 [1978]).

The rational basis test contains two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to the goals. *Home Builders Ass'n v. City of Overland Park*, 22 Kan. App. 2d 649, 671, 921 P.2d 234 (1996).

"Under that test, a statute is 'rationally related' to an objective if the statute produces effects that advance, rather than retard or have no bearing on, the attainment of the objective. So long as the regulation is positively related to a conceivable legitimate purpose, it passes scrutiny; it is for the legislature, not the courts, to balance the advantages and disadvantages." *Clark v. Walker*, 225 Kan. 359, 366, 590 P.2d 1043 (1979).

The legislature is not prohibited from making distinctions between classifications of persons. Rather, these constitutional limitations amount to a requirement that all persons similarly situated should be treated alike. *Home Builders*, 22 Kan. App. 2d at 671.

"[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature. [Citations omitted.] . . . [A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications*, 508 U.S. at 315.

One of the mechanisms established to assist in achieving the goals of the TIF statutes is to provide tax-based revenues and allow for the increased tax revenue to pay for the development and re-development of property. "[I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification." *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 253, 930 P.2d 1 (1996), *cert. denied* 137 L. Ed. 2d 1029 (1997). Under these standards, the amendments allowing auto race track facility special obligation bonds to have a maximum maturity of 30 years do not violate equal protection.

### 4. Standards for Governor's Determinations

As to relator's contention the legislature failed to give the Governor appropriate guidance for the determinations he is authorized to make under the legislation, relator argues the legislature has failed on two counts. First, L. 1998, ch. 17, § 2(h) fails to provide sufficient standards the Governor must use to determine that the "economic feasibility of the financing of an auto race track facility" depends on the bonds having a maximum maturity greater than 20 years. Second, relator argues L. 1998, ch. 17, § 2(l) fails to provide sufficient standards the Governor must use to determine that the development plan and each project within any additional area, not exceeding 400 acres, within the major tourism area will "enhance the major tourism area."

According to relator, the fundamental constitutional defect here is that the legislature has failed to provide *any* standard upon which the Governor is to base his determinations, and the two criteria, *viz.*, "economic feasibility of the financing of an auto race track facility" and "enhance the major tourism area," are so vague that the legislature has actually conferred unlimited legislative power and authority upon the Governor to make these determinations.

The Governor has already made findings regarding the additional 400-acre area for this project. Relator complains the Governor's finding in that regard, aside from the Governor's express reference to an attached development summary, is merely an unsupported recitation that the project for the additional 400 acres will enhance the major tourism area.

Great latitude is granted to the legislature to delegate certain functions to the administrative branch of government. Courts start with the presumption that " 'the legislature and the people have the right to assume that public officials will exercise their express and implied powers fairly, honestly and reasonably.' " *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. at 417. While standards must accompany a delegation of authority, " 'great leeway should be allowed the legislature in setting forth guidelines or standards and the use of general rather than minute standards is permissible.' " 230 Kan. at 417 (quoting *State ex rel. v. Bennett*, 222 Kan. 12, 21, 564 P.2d 1281 [1997]). Recently, we emphasized that flexibility in fashioning guidelines is desirable in light of modern day legal complexities and that standards may be implied from the statutory purpose. *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 305, 955 P.2d 1136 (1998). When the standard expressed in the statute is merely a finding of *necessity*, "[s]uch a determination of need is constitutionally adequate when coupled with the assumption that it will be made 'fairly, honestly and reasonably.' " *Tomasic*, 230 Kan. at 417.

This court has emphasized that " '[t]he modern trend, which we ascribe to, is to *require less detailed standards* and guidance to the administrative agencies *in order to facilitate the administration of laws in areas of complex social and economic problems.*' " (Emphasis added.) *Tomasic*, 264 Kan. at 305 (quoting *Guardian Title Co. v. Bell*, 248 Kan. 146, 153-54, 805 P.2d 33 [1991]).

The safeguards provided in the TIF statutes to check any abuse of executive power are extensive. Initially, a city enacts a resolution designating an area to be redeveloped as a major tourism area. L. 1998, ch. 17, § 2(a). Next, the city gives notice by resolution that it is considering a redevelopment district. The resolution contains extensive information about the geographic and physical nature of

the area. L. 1998, ch. 17, § 2(d). Following a public hearing, the city may adopt another resolution that contains any findings required by L. 1998, ch. 17, § 2(a), and that also contains a comprehensive plan that identifies all of the proposed redevelopment project areas and identifies all of the buildings and facilities that are proposed to be constructed or improved in the redevelopment area. Following the public hearing, the city also designates the redevelopment district by ordinance. L. 1998, ch. 17, § 2(e).

When the Governor renders a finding regarding an extended time period for repayment of special obligation bonds, he acts with extensive information supplied through the city's resolutions, public hearings, ordinances, and associated studies and documentation. As L. 1998, ch. 17, § 2(h) provides, it is the city that takes final action on the extension of the repayment period, because the special obligation bonds are issued by the city and the maturity of such bonds are contained in the city's ordinance authorizing the bonds. The Governor merely makes an advisory determination that is reported to the Speaker of the House of Representatives, the President of the Senate, and the city. This procedure provides adequate safeguards against any potential abuse of power. Given the presumption that public officials exercise their powers fairly, honestly, and reasonably, there is no reason to assume that this procedure lends itself to abuse by the Governor, and we have been shown none.

One of the standards associated with a required finding by the Governor is that the extension of time for repayment of the bonds "is *necessary* for the economic feasibility of the financing of an auto race track facility with special obligation bonds." L. 1998, ch. 17, § 2(h).

Information supplied by the city allows the Governor to make a determination and render a finding that the extension of time for repayment is "necessary" for the project to move forward. The detailed statutory procedure prior to and subsequent to the issuance of the Governor's finding provides context from which the Governor may infer the standard that governs the determination and finding. *Tomasic*, 264 Kan. at 305 (standards may be inferred from statute). The standard "necessary for the economic feasibil-

ity" is unambiguous and clearly contemplates a finding that the extension of time is a prerequisite to the economic feasibility for the proposed auto race track facility.

In *Tomasic*, 230 Kan. 404, this court was faced with a similar challenge to the delegation of authority to a city or county regarding the transaction of business by a port authority. The statute at issue provided that the port authority "shall not transact any business or exercise any powers . . . unless the governing body of the city by appropriate ordinance, or the county by appropriate resolution, declares that there is a *need* for an authority to function in the city or county." 230 Kan. at 417. The relator in *Tomasic* argued that this delegation was without adequate standards for the exercise of such authority by a city or county. We held that "[s]uch a determination of need is constitutionally adequate when coupled with the presumption it will be made 'fairly, honestly and reasonably.' " 230 Kan. at 417. Our holding in *Tomasic* is equally applicable here.

As to the required finding by the Governor that an additional area, not to exceed 400 acres, will enhance the major tourism area, the Governor may make this finding only after the other procedures specified in L. 1998, ch. 17, § 2(a) through (h) have been completed, *i.e.*, the city must conduct independent investigations, enact resolutions, hold a public hearing, and enact an ordinance designating the redevelopment area. This procedure provides adequate safeguards to ensure that the Governor will make a fully informed decision regarding the inclusion of an additional area. The Governor approves each specific project in the additional area, and the city is then required to provide an annual report to the Governor, the Secretary of KDOCH, and the legislature regarding the status of projects in the additional area. The specific standard associated with the finding required by the Governor is whether the development plan and the projects within the additional area will "enhance the major tourism area." The "enhance" standard is unambiguous and clearly contemplates the provision of additional economic benefits to the major tourism area. The "enhance" standard meets the test articulated by this court regarding delegated authority in that it allows the Governor to know his rights, obligations, and limitations thereunder.

The modern trend is to require less detailed standards. Standards are difficult to define because of the variable nature thereof. The fact the law can be improved does not make it unconstitutional. When read as a whole, the amendments set forth sufficient standards. The Governor's finding regarding the addition of 400 acres to the major tourism area in Wyandotte County follows the delegated standard.

### 5. Art. 2, § 17

Relator next contends the legislation does not meet the requirements of Art. 2, § 17 of the Kansas Constitution for either laws of a general nature or for special legislation.

Art. 2, § 17 of the Kansas Constitution provides:

"All laws of a general nature shall have a uniform operation throughout the state: *Provided*, The legislature may designate areas in counties that have become urban in character as urban areas and enact special laws giving to any one or more of such counties or urban areas such powers of local government and consolidation of local government as the legislature may deem proper."

Relator agrees that L. 1998, ch. 17 is a law of a general nature because it is a law dealing with tax increment financing of redevelopment projects, which is common to all people of the state. However, relator argues it does not have uniform operation throughout the state because the amendments in the bill apply only to an auto race track facility and related projects to be built in a specific, legally described area of Wyandotte County, thereby preventing geographic uniformity in the application of the law throughout the state.

We hold the legislation in question contains laws of a general nature, operating, in both fact and theory, with geographic uniformity throughout the state. As we read the amendments, they contemplate uniform application throughout the state, and the entire body of urban redevelopment/TIF statutes, including the authority to designate major tourism areas, applies to all cities in Kansas. The statutes, for instance, refer to "any city" and "by authorizing cities." See, *e.g.*, L. 1998, ch. 17, § 1.

A boundary description for an auto race track facility in Wyandotte County is contained in L. 1998, ch. 17, § 2(e). That statute

states only that the boundaries of a major tourism area in Wyandotte County that includes an auto race track facility must be at the statutorily specified location. Notwithstanding that provision, any city in the state could use the benefits of the TIF statutes for an auto race track facility, if the city meets the requirements of the statutes.

In *Board of Riley County Comm'rs v. City of Junction City*, 233 Kan. 947, 957-959, 667 P.2d 868 (1983), we agreed with the district court's rationale that annexation legislation did not violate Art. 2, § 17 because it operated with geographic uniformity throughout the state even though its operation, as a practical matter, was basically confined to four cities touching, or in proximity with, the Fort Riley military reservation. Likewise, the legislation here is constitutional as it complies with the requirements of Art. 2, § 17.

### 6. Urban Area

A number of relator's arguments become moot by reason of our holding the amendments at issue are laws of a general nature, uniformly applicable throughout the state. Among the arguments so mooted are those related to the failure to designate Wyandotte County an "urban area" and alleging they contain an improper subject matter for special legislation.

### 7. The 25% Premium

Relator next contends the statutory requirement that a 25% premium be paid to homeowners whose land is condemned for the development of an auto race track facility is unconstitutional in that it violates (1) the Fifth Amendment to the United States Constitution, as applicable to the states through the Fourteenth Amendment, because the government is constitutionally required to pay only just compensation for condemned land and nothing more, and (2) §§ 1 and 2 of the Kansas Constitution Bill of Rights as well as the Equal Protection Clause of the United States Constitution by creating a distinction between landowners who receive a 25% premium when their land is condemned for development of an auto race track facility and all other landowners whose land may later be condemned for other purposes.

L. 1998, ch. 17, § 5(a) provides in part:

"In addition to the compensation or damage amount finally awarded thereunder with respect to any property subject to proceedings thereunder as a result of the construction of an auto race track facility, such city shall provide for the payment of an amount equal to 25% of such compensation or damage amount."

Relator first argues that only "just compensation" and nothing more may be paid for private property taken for public use and that any required payment greater than what is "just compensation," in this case the 25% premium, is unconstitutional. Relator also argues the required premium is unconstitutional because it imposes upon other Kansas citizens an increased obligation above and beyond what is required and directly increases the cost to users of the race track facility and to Kansas citizens who are not within the race track redevelopment area. Relator then asserts that although the Fifth Amendment to the United States Constitution is generally thought of as protection for property owners whose land is being taken for a public purpose, it also provides protection to other citizens whose land is not condemned by preventing the government from overpaying for condemned property.

The applicable law in Kansas provides that a condemning authority must pay just compensation for the taking of private property. We know of no provision that prohibits the legislature from requiring a condemning authority to make additional payments beyond "just compensation." The Fifth Amendment to the United States Constitution requires only that just compensation be paid for the taking of private property. It does not prohibit a condemning authority from paying more than what is determined to be just compensation.

Kansas law provides for the payment of additional compensation in some other circumstances. For example, L. 1998, ch. 17, § 6 requires relocation assistance payments as a part of redevelopment projects. *Spackman v. Spackman*, 3 Kan. App. 2d 400, 595 P.2d 748 (1979), upholds the requirement of federally authorized housing relocation assistance payments and notes that the purpose of such payments is to supplement traditional eminent domain compensation, not to create an additional element of full compensation.

The 25% premium, by comparison, is also "in addition to and independent of the damages" finally determined to be just compensation for the taking. Requiring the premium calculation to be based on the amount of damages finally awarded in a condemnation proceeding does not change the character of the 25% premium from additional compensation to a part of what is "just compensation."

*Amicus curiae*, who also contends the amendments to the TIF statutes are unconstitutional, argues that if we nevertheless find the amendments constitutional, we should also find the 25% premium constitutional. The *amicus curiae* brief cites five cases to support this argument. We believe three of the cases lend support to the argument in favor of the 25% premium.

In *Electric Company v. Dow*, 166 U.S. 489, 41 L. Ed. 1088, 17 S. Ct. 645 (1897), the United States Supreme Court first approved a provision mandating that an owner was to be paid additional damages in the amount of 50% of the taking value. *Dow* was not a condemnation case, however, and it was dismissed for lack of jurisdiction. In the opinion, the Supreme Court stated:

"We agree with the Supreme Court of New Hampshire in thinking that the plaintiff in error, by availing itself of the power conferred by the statute, and joining in a trial for the assessment of the damages, is precluded from denying the validity of that provision which prescribes that fifty per cent shall be added to the amount of the verdict. The act confers a privilege, which the plaintiff in error was at liberty to exercise or not as it thought fit." 166 U.S. at 490.

While this statement may be viewed as dicta in light of the dismissal for lack of jurisdiction, we believe the Unified Government, by availing itself to L. 1998, ch. 17, should be precluded from denying the validity of the provision which prescribes that 25% shall be added to what is determined to be just compensation.

*Mitchell v. United States*, 267 U.S. 341, 69 L. Ed. 644, 45 S. Ct. 293 (1925), and *Joslin Co. v. Providence*, 262 U.S. 668, 67 L. Ed. 1167, 43 S. Ct. 684 (1923), both stand for the proposition that the legislature has the power to compensate losses and damages beyond those traditionally included in the interpretation of "just compensation."

*Mitchell* involved a request for consequential damages for losses to a business when land was taken through eminent domain proceedings for the Aberdeen Proving Ground in Maryland. In the opinion in that case, the Supreme Court stated:

"[I]t does not follow that, in the absence of an agreement, the plaintiffs can compel payment for such losses. To recover, they must show some statutory right conferred. States have not infrequently directed the payment of compensation in similar situations. The constitutions of some require that compensation be made for consequential damages to private property resulting from public improvements. [Citations omitted.] Others have, in authorizing specific public improvements, conferred the right to such compensation. [Citations omitted.] Congress had, of course, the power to make like provision here." 267 U.S. at 345-46.

*Joslin Co.* involved the condemnation of land for the acquisition of a municipal water supply. There, the Supreme Court stated:

"In respect to the contention that the statute extends the right to recover compensation so as to include these and other forms of consequential damages and thus deprives plaintiffs in error, as taxpayers of the city, of their property without due process of law, we need say no more than that, while the legislature was powerless to diminish the constitutional measure of just compensation, we are aware of no rule which stands in the way of an extension of it within the limits of equity and justice, so as to include rights otherwise excluded. As stated by the Supreme Court of Massachusetts in *Earle v. Commonwealth*, 180 Mass. 579, 583, speaking through Mr. Justice Holmes, who was then a member of that court: 'Very likely the. . . rights were of a kind that might have been damaged if not destroyed without the constitutional necessity of compensation. But some latitude is allowed to the Legislature. It is not forbidden to be just in some cases where it is not required to be by the letter of paramount law.' " 262 U.S. at 676-77.

"[T]he constitutionally required just compensation 'is a minimum, not a maximum entitlement. The legislature cannot require an owner to accept less, although it is free . . . to provide for more.' " *State Roads Comm'n v. 370 Limited Partnership*, 325 Md. 96, 112, 599 A.2d 449 (1991) (quoting *State Roads Comm'n v. Cornell Co.*, 85 Md. App. 765, 784, 584 A.2d 1331 [1991]).

We conclude the legislature can authorize a premium if it so desires, and such premium is not otherwise barred by issues not before us.

### 8. Cash Basis and Full Faith and Credit

Relator next contends that certain provisions of the Develop-

ment Agreement violate the Cash Basis Law, K.S.A. 10-1101 *et seq.*, and the full faith and credit provisions of K.S.A. 1997 Supp. 12-1774(b)(1), as amended by L. 1998, ch. 17, § 3(b)(1), by requiring certain sales tax revenues to be used to repay the STAR bonds, by obligating the Unified Government to issue full faith and credit bonds, and by committing future Unified Governments to make annual appropriations to repay both the STAR and TIF bonds. In general, the cash basis law prohibits municipalities from creating indebtedness in excess of funds actually on hand in the treasury of the municipality. K.S.A. 10-1113. Contracts entered into by municipalities in violation of the Cash Basis Law are void. K.S.A. 10-1119.

L. 1998, ch. 17, § 3(b)(1) prohibits a city from issuing full faith and credit tax increment bonds to finance the undertaking of a redevelopment project that will create a major tourism area of the state as specified in L. 1998, ch. 17, § 3(a)(1)(D). Full faith and credit bonds bind the municipality's future governing bodies to take all actions necessary, such as the levying of taxes, to ensure repayment of the bonds. In this case, the amendment to K.S.A. 1997 Supp. 12-1774(b)(1), prohibits the Unified Government from issuing full faith and credit tax increment financing bonds to finance the undertaking of the auto race track redevelopment project.

Paragraph 2 of the Agreement contains the following language:

"Unified Government agrees that the City/County portion of the sales tax revenue shall be available for payment of Debt Service on the Phase I and Phase II STAR Bonds."

STAR bonds are special obligation bonds, repayment of which will come from the collection of state sales tax revenue generated from within all or a portion of a redevelopment area. Phase I and Phase II refer to different phases of construction of the auto race track facility. Phase I includes a 75,000-seat capacity race track. Phase II includes an expansion of the race track to a 150,000-spectator facility.

Relator argues Paragraph 2 violates the Cash Basis Law in that it commits the Unified Government to retire the STAR bonds

when such indebtedness neither satisfies the requirements of K.S.A. 10-1113 nor fits within any exception contained within K.S.A. 10-1116.

While K.S.A. 10-1113 does generally prohibit municipalities from creating indebtedness in excess of funds actually on hand, this proscription is prefaced with the phrase "[u]nless otherwise provided by this act." Therefore, the Cash Basis Law clearly allows the creation of indebtedness in excess of funds on hand when specifically authorized by the Cash Basis Law.

The exceptions to the general proscription of K.S.A. 10-1113 are set out in K.S.A. 10-1116. K.S.A. 10-1116(a)(2) states:

"(a) The limits of indebtedness prescribed under the provisions of article 11 of chapter 10 of Kansas Statutes Annotated may be exceeded when: . . . (2) provision has been made for payment by the issuance of bonds or temporary notes as provided by law."

L. 1998, ch. 17, § 3(a)(1) expressly authorizes "[a]ny city . . . to issue special obligation bonds . . . to finance the undertaking of any redevelopment project." It further provides that the special obligation bonds may be payable from "a pledge of a portion or all of the revenue received by the city from transient guest, sales and use taxes . . . collected from taxpayers doing business" within the redevelopment district.

Because Paragraph 2 only commits the Unified Government to make the city/county portion of the sales tax revenues generated from within the Redevelopment District available for payment of debt service on the special obligation STAR bonds, the provision falls squarely within the K.S.A. 10-1116(a)(2) exception, and relator's claimed violation of the Cash Basis Law is without merit.

Relator also argues Paragraph 2 violates L. 1998, ch. 17, § 3(b)(1) because it commits future governments to estimate and commit sales tax revenues to retire the bonds and because the nonrecourse provision ensures that despite any provision contained in the bond documents, the Unified Government will be obligated and future governments will be compelled to commit future sales tax revenues to pay off the bonds. Therefore, relator asserts, the bonds which will be issued will be the equivalent of full faith and credit bonds.

In addition, relator argues the Agreement provides that in the event there is a surplus of tax revenue collected from the project, the Unified Government will be entitled to utilize the surplus sales tax revenue for its own purpose, but any surplus sales tax revenue will also result in a credit against the indebtedness that KISC is obligated to pay.

The commitment to pledge sales tax revenues to repay the STAR bonds does not violate the full faith and credit provision of 12-1774(b)(1). That statute references the sources of funds that legally can be used to repay the principal and service the debt on special obligation bonds. These sources include funds from any private sources, contributions, or other financial assistance from the state or federal government, L. 1998, ch. 17, § 3(a)(1)(C), and from a pledge of a portion or all of the revenue received by the city from transient guest, sales, and use taxes, L. 1998, ch. 17, § 3(a)(1)(D). These are the only sources of funds that are contemplated to be used to pay debt service on the special obligation bonds that are proposed to finance the undertaking of this redevelopment project. Full faith and credit bonds will not be issued.

Relator's claim regarding the crediting of surplus sales tax revenues against KISC's annual payment is without merit because KISC will not automatically receive any credit against its annual payments towards retirement of the TIF bonds from any surplus sales tax revenues. The language of the Agreement provides that if the KISC auto race track property would become subject to property tax during the period for which KISC is obligated to make annual payments towards retirement of the principal and interest on the TIF bonds (even though it is exempt from property taxes under L. 1998, ch. 17, § 2[k]), KISC would receive a credit against the annual payments it makes on the TIF bonds. The credit would be in an amount equal to all property taxes received by the Unified Government and all surplus sales tax revenue, which are applicable city/county sales taxes received by the Unified Government in excess of the debt service on the STAR bonds.

The annual payment KISC is obligated to make under the Agreement is not to retire the principal and interest on the STAR bonds, but to retire principal and interest on the TIF bonds. Paragraph 2

provides that it is the STAR bonds, not the TIF bonds, which are nonrecourse to KISC.

Relator also contends Paragraph 6 of the Agreement violates both the Cash Basis Law and L. 1998, ch. 17, § 3(b)(1).

Paragraph 6 contains the following language:

"No General Obligation Bonds shall be issued to finance the Total Project, however, Unified Government agrees to pledge annual appropriation[s], if necessary, to obtain Bond insurance on the TIF Bonds and the STAR Bonds (Phase I and II)."

Relator argues that, through this provision, the Unified Government pledged its annual appropriations of revenue to insure repayment of the TIF and STAR bonds, thereby doing exactly what the legislature was trying to prevent when it passed the Cash Basis Law.

The Unified Government and KISC have agreed only that future governing bodies of the Unified Government will consider appropriating funds in future years should a debt service shortfall occur with regard to the TIF or STAR bonds. If such a shortfall does occur, the then-current governing body would be requested to make its own independent legislative determination whether to appropriate the funds requested. Any appropriation for a debt service shortfall would be contingent on future legislative action by the Unified Government and, therefore, Paragraph 6 does not create indebtedness. See *Edwards County Comm'rs v. Simmons*, 159 Kan. 41, 151 P.2d 960 (1944); *International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, 798 P.2d 960 (1990), *rev. denied* 248 Kan. 996 (1991). Since no indebtedness arises from the provisions of Paragraph 6, there can be no violation of the Cash Basis Law.

Relator claims that what is most offensive about Paragraph 6 is not the commitment to pledge future revenues, but the fact that the Unified Government delegated its budgeting decision to some outside entity, *viz.*, a New York bond insurance company, in order to obtain bond insurance. Relator does not explain this assertion.

We hold there is no merit to relator's contentions and there is no violation of the Cash Basis Law or full faith and credit provision of the amendments.

## 9. Redevelopment and Relocation Plans

The last issue relator raises concerns the timing of the acquisition of real property interests needed for the redevelopment project. Relator first argues that, in violation of the provisions, spirit, and intent of the law, the Unified Government has already extended offers to purchase land located in the redevelopment area. At oral argument, we were informed that approximately one-half of the property owners have entered into options with KISC to sell their property. The offers are in the form of an option or "contingent" real estate contract. Relator then argues the Unified Government has violated and continues to violate K.S.A. 12-1772, K.S.A. 1997 Supp. 12-1773(a), as amended, and K.S.A. 12-1777, as amended, by acquiring interests in real property prior to the adoption of a redevelopment plan and a relocation assistance plan.

Relator argues that the fact KISC is the entity acquiring the options is a matter of form, rather than substance, that does not cure the statutory violations.

Together, 12-1772 and 12-1773(a) require a city to first adopt a redevelopment plan prior to the acquisition of any real property for the redevelopment project. Relator argues that the Unified Government has violated the rights of property owners in the proposed race track area, as well as the rights of all citizens, taxpayers, and elected officials of the Unified Government, by denying them the right to a meaningful public hearing on the redevelopment plan. While a hearing on a redevelopment plan is scheduled, relator asserts such a public hearing will be nothing more than a "rubber stamp" exercise because the Unified Government has already begun to acquire land in the redevelopment area.

K.S.A. 1997 Supp. 12-1773(a), as amended by L. 1998, ch. 17, § 5(a), states in relevant part:

"Any city which has adopted a redevelopment plan in accordance with the provisions of this act may purchase or otherwise acquire real property. Upon a ⅔ vote of the members of the governing body thereof a city may acquire by condemnation any interest in real property, including a fee simple title thereto, which it deems necessary for or in connection with any redevelopment plan of an area located within the redevelopment district."

Relator also contends the Unified Government has violated and continues to violate 12-1777, as amended by L. 1998, ch. 17, § 6, because it is acquiring interests in real property prior to the adoption of a relocation assistance plan.

In relevant part, K.S.A. 12-1777, as amended, states:

"Before any redevelopment project shall be initiated under this act a relocation assistance plan shall be approved by the governing body proposing to undertake the project."

Finally, relator contends respondent's actions in acquiring the options to purchase prior to a meaningful public hearing and approval of the redevelopment plan and relocation assistance plan trample on the due process rights of the property owners. Relator, however, fails to explain this alleged due process violation.

KISC has made an offer as a willing buyer and private entity to enter into a contingent real estate contract with these property owners. The Unified Government has not made any offers to purchase property and has not entered into any contract to purchase property.

As noted, K.S.A. 1997 Supp. 12-1773(a), as amended, states in relevant part that "[a]ny city which has adopted a redevelopment plan in accordance with the provisions of this act may *purchase or otherwise acquire real property.*" (Emphasis added.) Even if the Agreement did contemplate the Unified Government's acquisition of options on properties through the use of pooled escrow funds prior to the adoption of a redevelopment plan and relocation assistance plan, this alone does not constitute a violation of the statute. No violation would occur until the Unified Government purchased or otherwise acquired real property in the redevelopment area prior to the adoption of redevelopment and relocation assistance plans. Even if the Unified Government is deemed to have obtained an option or entered into a contingent real estate contract to purchase property, such action would not violate the statutes in question because obtaining an option or entering into a contingent real estate contract does not amount to the purchase or acquisition of property. Nor do moneys spent for general title and survey work amount to the purchase or acquisition of property.

Relator's claim that the due process rights of property owners are being violated is also based on an erroneous claim that the Unified Government is actually acquiring options on properties prior to the adoption of a redevelopment and relocation assistance plan. For this reason, the alleged due process violation has no merit. Any such offer made would constitute only a contingent contract with no guarantee that the contingencies will be satisfied. Therefore, no property interest would be created by the option, and without a property interest there could be no due process violation.

We hold that the Unified Government has not purchased or otherwise acquired real property prior to the adoption of a redevelopment plan and relocation assistance plan.

For the reasons stated herein, the State's petition for a writ of quo warranto is denied.